**COMMONWEALTH of Pennsylvania**

v.

**1997 CHEVROLET and Contents Seized From James Young.**

**Appeal of: Elizabeth Young.**

**Commonwealth of Pennsylvania**

v.

**The Real Property and Improvements known as 416 S. 62nd Street, Philadelphia, PA 19143.**

**Appeal of: Elizabeth Young.**

Commonwealth Court of Pennsylvania.

Argued May 14, 2014.

Decided Dec. 17, 2014.

---

Jessica M. Anthony, Philadelphia, for appellant.

Jonathan M. Levy, Assistant District Attorney, Philadelphia, for appellee.

BEFORE: DAN PELLEGRINI, President Judge, and BONNIE BRIGANCE LEADBETTER, Judge, and RENÉE COHN JUBELIRER, Judge, and ROBERT SIMPSON, Judge, and MARY HANNAH LEAVITT, Judge, and P. KEVIN BROBSON, Judge, and PATRICIA A. McCULLOUGH, Judge.

OPINION BY Judge LEAVITT.

Elizabeth Young appeals an order of the Court of Common Pleas of Philadelphia County (trial court) that granted the Commonwealth of Pennsylvania's petition for the forfeiture of her home and her 1997 Chevrolet minivan. The trial court held that the forfeited property had facilitated the illegal sale of marijuana by Young's son, who lived with her, and it rejected Young's defense that she neither knew of nor consented to her son's conduct. The trial court also rejected Young's claim that the forfeiture of her home imposed an excessive fine for a criminal offense that consisted of her son's four sales of marijuana, with a total value of approximately $90,[1] and in which she had no involvement.

---

1. As set forth *infra,* the Commonwealth showed that Young's son sold $20 worth of marijuana to a confidential informant two times and on a third occasion he sold $50 worth of marijuana, for total sales of $90. Notes of Testimony, May 1, 2012, at 17, 18, 20 and 21. The Commonwealth did not establish the dollar amount of the sale in the fourth controlled buy. These four sales served as the basis for the Commonwealth's argument that the forfeiture of Young's property did not impose an excessive fine on her. The district attorney asserted that the maximum fine for the conduct of Young's son was $80,000. *See* n.8, *infra.* It appears that this calculation applied to both the vehicle and the house.

For the reasons set forth below, we reverse and remand.

### Factual and Procedural History

During the period of time relevant to this appeal, Donald Graham lived with his mother, Elizabeth Young, at her home at 416 South 62nd Street in Philadelphia. Police suspected Graham of selling marijuana. Accordingly, in November 2009, the police set up three controlled buys by having a confidential informant call Graham at his mother's home, after which Graham proceeded to a meeting point where the marijuana transactions took place. On November 19, 2009, police executed a search warrant at Young's home. They told her that her son was selling drugs and that they were there to arrest him. They did not do so. Instead, they set up another controlled buy, but this time the confidential informant called in person upon Graham at Young's house. Three more controlled buys were set up, and on January 7, 2010, police arrested Graham at Young's home.[2]

One month later, the Commonwealth filed a petition for the forfeiture of Young's home and her vehicle under Sections 6801–6802 of the Judicial Code, commonly known as the Controlled Substances Forfeiture Act (Forfeiture Act), 42 Pa.C.S. §§ 6801–6802. In 2011, the Commonwealth amended its forfeiture petition to add the claim that another person, Baron Adams, had used Young's house for illegal purposes. On May 1, 2012, the trial court conducted a hearing on the Commonwealth's amended forfeiture petition. The Commonwealth and Young each presented evidence.

The Commonwealth presented the testimony of Officer Robert Billips of the Philadelphia Police Department's Narcotics Field Unit, which "target[s] street level narcotics and houses that sell from—individuals that sell from locations." Notes of Testimony, May 1, 2012, at 30 (N.T. ——). Billips testified about the three "controlled buys" that police set up in November of 2009. N.T. 5. In a controlled buy, police send an undercover officer or informant to purchase a controlled substance from a suspect.[3] The controlled buy employs a standard procedure: police search the informant to insure he has no drugs before meeting the suspect; give the informant marked bills; and send him to meet the suspect at a spot where police have set up their surveillance.

The first controlled buy took place on November 10, 2009. Billips and his partner searched the informant for drugs; gave him $40 in prerecorded buy money; dialed Graham's cell phone number and handed the phone to the informant. After the call, Billips saw Graham leave Young's home and walk to the corner of 62nd and Pine Streets to meet the informant. Billips watched Graham take the buy money and hand the informant a "small item" that had been "[s]omewhere on his person." N.T. 4, 12. Thereafter, the informant gave Billips a baggie with four grams of marijuana. The second controlled buy took place on November 14, 2009, and it was identical to the first except that this time Graham drove to the corner of 62nd and

---

**2.** The specific charges filed against Graham are not known. A Philadelphia news article reported that Graham pleaded guilty to possession and sale of marijuana, for which he was sentenced to 11 to 23 months of house arrest. No fine was imposed. Chris Mondics, *Law Review: Loss of Assets Shines Light on Civil Forfeiture*, PHILADELPHIA INQUIRER, June 30, 2014. http://articles.Philly.com/2014-07-01/news/50977538_1_Forfeiture-elizabeth-young-drug-dealers (last visited 11/06/2014).

**3.** http://www.shannonsextonlaw.com/Practice-Areas/A-Controlled-Buy-Analysis.shtml.

Pine Streets in his mother's minivan.[4] The third controlled buy took place on November 16, 2009, and it was identical to the second controlled buy, except that this time Graham walked to the designated meeting point and the informant was given $20 in marked bills. Billips did not specify the amount of marijuana recovered from the informant in the second or third controlled buys. The time of day for these controlled buys was not specified but ranged between noon and 1:00 p.m. and between 6:00 p.m. and 8:00 p.m.

On cross-examination, Billips acknowledged that he could not see what Graham handed the informant in any of the controlled buys. He also acknowledged that the "small item" handed over by Graham could be "held comfortably in a pants pocket." N.T. 12.

Three days later, on November 19, 2009, Billips helped execute a search warrant at Young's home. Billips testified that the police confiscated several items found in the dining room: a letter addressed to Graham; a scale; baggies and clear packets. Two of the baggies or packets contained marijuana. Billips did not identify the amount of marijuana or indicate whether the packets were lying in plain view, placed in a drawer or secreted in some fashion. Graham was not at the house during the search but Young was present. Billips testified that he told Young that the police were there to arrest her son for selling drugs. Specifically, he testified:

> We explained that her son had been selling drugs out of the house and using a vehicle on several different days. We left her a copy of the search warrant and a copy of the probable cause.

N.T. 8–9. According to Billips, Young "was in disbelief" when police informed her that her son was selling drugs. N.T. 14–15.

The police did not arrest Graham that day, in spite of their declared intention to do so. Instead, they decided to do "an investigation into the property situated on 416 S. 62nd St." Trial Court Op. at 3. To that end, the Narcotics Field Unit set up more controlled buys, this time under the direction of Officer Nathan London. The first took place on December 4, 2009, at 4:22 p.m., two weeks after the search of Young's home. London acted strictly as the observer. Other officers handled the informant, and London stayed in radio contact with them during the controlled buys.

London testified that at the December 4, 2009, controlled buy, the informant, given $20 in prerecorded cash, knocked on the door of Young's home. When Graham answered, London saw the informant hand Graham cash. Graham went back inside the house, and reappeared two minutes later to hand the informant "small objects." N.T. 17. The informant gave his handler a baggie containing marijuana, but London did not specify the amount.

In January, police set up three more controlled buys. The first took place on January 5, 2010, at 4:10 p.m. London testified that the informant, given $20 in marked bills, appeared at Young's house, and Graham left by the side door. He and the informant then walked to Young's minivan, which was parked nearby, and got inside. London did not testify that he could see or hear what happened in the vehicle. The handler radioed London when the buy was completed; the informant's baggie tested positive for marijuana, but London did not specify the amount.

---

4. When seized, the minivan was titled to "James Young," who was, presumably, Elizabeth Young's late husband. Young testified that the vehicle belonged to her. N.T. 60.

The following day, at 6:45 p.m., police set up another controlled buy, identical to the others, although London did not know the amount of marked bills given to the informant. London saw the informant knock on the door of Young's house and enter the house. Graham walked to the minivan, which was parked on the street, and returned to the house. The informant left and gave his handler a baggie with a "weed and seed substance, alleged marijuana," and $15 in change. N.T. 20. London did not specify the amount of "alleged marijuana."

On January 7, 2010, at 4:40 p.m., the police set up the final controlled buy, which ended with Graham's arrest. The informant, given $60 in prerecorded marked bills, appeared at the house. London testified that Graham exited the house and handed the informant small objects in exchange for the cash. Thereafter, the informant turned over two baggies of an unspecified amount of marijuana and $10 in change to his handler. Minutes later, Graham was arrested on the steps of Young's house.

Two of the three officers in radio communication with London also testified. They confirmed that they had followed the standard procedure for a controlled buy and explained that they did not witness the actual transactions.[5]

When the police arrested Graham, they found several items on his person: a baggie containing approximately 4.6 grams of marijuana, a cell phone, keys to Young's house and minivan, and $176 in U.S. currency, which included the $60 in prerecorded bills given that day to the informant. Police then searched the house and vehicle. They recovered 1.3 grams of marijuana "in loose form," i.e., "not packaged for delivery," from the living room; London estimated that the loose marijuana had a street value of $20 to $25. N.T. 27, 35. Over the objection of Young's counsel that the Commonwealth had not notified Young in advance of the trial that London would be offered as an expert, London opined that the loose marijuana was not for Graham's personal use but for his dealing. In the vehicle, police found a baggie containing 8.5 grams of marijuana, but London did not specify whether the marijuana was hidden or in plain view.

On cross-examination, London confirmed that in each of the drug transactions he witnessed, the package given to the informant was small enough for Graham to keep on his person. London admitted that he did not know what Graham did when he went inside the house, after the informant knocked on the door, and that he never saw Graham retrieve any item, large or small, from either the house or the vehicle.

The Commonwealth did not present the informant or informants to testify about any of the controlled buys involving Graham. Billips and London acknowledged that they could not hear the conversations between Graham and the informant.

The Commonwealth's final witness was Officer Jeffrey Walker of the Narcotics Field Unit, who testified about the facts set forth in the amended forfeiture petition. On April 25, 2011, at 4:00 p.m., Walker saw an individual named Baron Adams leave Young's house, take a baggie from his pants pocket and hand it to an unidentified male in exchange for money. Adams then got in a Jeep Cherokee and drove away; police followed the vehicle and arrested Adams. Later that day Walker searched Young's house and recovered the following items from the

---

5. Young objected to the testimony of one of the officers because he did not appear at his scheduled deposition, but the objection was overruled.

basement: a scale; "large" Ziplock bags containing marijuana residue; and a checkbook and birth certificate in the name of Baron Adams. N.T. 48. In a second floor bedroom, Walker found letters addressed to Adams both at Young's address and another address.[6] Walker's search of the Jeep Cherokee revealed a plastic bag with 521 grams of marijuana. Graham was present during the search of Young's house, but he was not arrested or charged in connection with the Adams incident.

Young, who is retired from Amtrak, testified on her own behalf. She bought the house at 416 South 62nd Street with her former husband, David McIver, in the 1970's and has lived there ever since. She acquired the 1997 Chevrolet Venture minivan from her late husband, James Young. Young acknowledged that her son, Graham, had a drug problem at one time in the past. During that period, Young did not speak to her son or allow him to be part of her life because she disapproves of drugs. Young explained that in 2009 she allowed her son to move into her house because he had stopped using drugs. He began providing for his children and attending church, thereby making "a change in his life for the good." N.T. 65.

Young stated she has a South Carolina driver's license. Because a chronic health condition prevents her from driving, others, including Graham, another son, "Lonnie," and church members use the minivan to drive Young where she needs to go. N.T. 81. Young testified that she expects Graham, the primary driver, to pay for the minivan's upkeep.

Young testified that she had been hospitalized in October and November 2009 for two blood clots in her lungs and was on bed rest when the police appeared at her house on November 19, 2009. N.T. 68. Thereafter, in late 2009 and early 2010, Young spent a considerable amount of time at her mother's house in Yeadon, Pennsylvania. In addition, Young made at least six trips to South Carolina to attend to personal business related to her late husband's estate.

The police broke down the door to Young's home on November 19, 2009, because, as Billips explained, she did not answer within "35 seconds" of their knock. N.T. 13. Young stated that she was in her bedroom on the second floor recovering from the pulmonary blood clots. When she came out, police ordered her back into her bedroom. Her account directly contradicted Billips' testimony that she was in the dining room and saw them discover the two packets of marijuana there. Billips, who testified from his notes, was not recalled by the Commonwealth to refute Young's account of where she was when the police did their search.

In addition to damaging her front door, the police punched holes in the walls in their search for drugs. Young had never experienced anything like it. When she asked the police what was happening, they told her that her son was selling drugs from the house and that they had "pictures" of this. N.T. 62. She responded: "I want to see that right now." *Id.* However, the police did not show her anything and still have "not to this day." N.T. 81.

Young testified that while Graham was living with her, she never saw any drugs in her house or minivan and would never allow drugs in her home or in her minivan.

---

**6.** Walker testified about a safe in a second floor bedroom that contained $4,020 in cash. Young testified that she had given some of that cash to Graham to pay the real estate taxes. Young testified that she was working with other counsel to get her cash returned. N.T. 80. The cash was not part of the Commonwealth's forfeiture petition.

Young believed that Graham was no longer involved with drugs because she did not "smell that same scent" of drugs on Graham that she had detected in the past. N.T. 64. Had she known her son was selling marijuana, she would have thrown him out of the house, as she had done previously. She stated that she would have called the police herself. She explained that she did not take these steps after the November search because "nobody ever showed me any kind of proof." N.T. 78. Young explained her position as follows:

**Q.** [by assistant district attorney] Would it be fair to say that even if [the police] showed you some proof you wouldn't believe it?

**A.** [by Young] If they showed me some proof that he was out there selling drugs from my house, yes, I would believe it.

**Q.** You would believe it?

**A.** I would believe it.

N.T. 78–79. Young testified that she did not know anything about Graham's arrest and that she was not present in the house on January 7, 2010. N.T. 67.

On cross-examination, Young was asked whether she ever requested the police to search her house for drugs, and she replied in the negative. She explained that she was afraid of the police as a result of their conduct on November 19, 2009, when they burst into her house "like [something] you'd see on television." N.T. 79.

Young testified that she had seen Adams at her house on two occasions. She did not know, or believe, that Adams was using her home to receive mail or for any other purpose. She did not allow him to sell drugs from her house.

Young described her neighborhood as closely knit. There is a block captain and neighbors watch out for each other's homes and advise each other of neighborhood problems. Young testified that the neighborhood watch had not received any complaints about her son or reported any to her. To the contrary, the neighbors complimented the maintenance work he was doing on houses in the neighborhood.

Young's counsel offered into evidence a deposition of Young's neighbor, who has lived on the block for 50 years and knows both Young and Graham well; the deposition was admitted. N.T. 82.[7] Young's counsel placed an oral summary of the neighbor's deposition into the record because the trial court did not wish to have the deposition transcript read into the record. The Commonwealth did not object to the summary. The neighbor is able to see Young's house from her own house and stated that she would be quite surprised should it turn out that Graham sold drugs there. The neighbor belongs to the neighborhood watch and regularly attends its meetings; she has never heard any concerns voiced about Young's house. The neighbor stated that she would have noticed if there was drug activity at or near Young's house, such as strangers going in

7. The neighbor was not available to testify at the forfeiture hearing because she had to be out of town that day. In response to the offer of Young's counsel to read the deposition into the transcript, the judge responded that she had "two copies." N.T. 83. Although the deposition was admitted, it was not in the record certified by the trial court and sent to this Court.

The dissent notes, correctly, that the Commonwealth did not attend the deposition. Young offered to keep the record open to allow a cross-examination of the neighbor, but the trial court refused the suggestion. There was a pause in the hearing during which it appears that the Commonwealth's attorney reviewed the deposition transcript. Thereafter, Young's attorney summarized its contents.

and out of the house, but she saw nothing of the sort. She testified, specifically, "that she does not consider Young's house to be a nuisance." N.T. 84. The neighbor stated that she considers Young to be a good neighbor.

Finally, Young submitted into evidence an appraisal setting the value of her house at $54,000. There was no evidence presented of the minivan's value. The Commonwealth did not present any evidence on rebuttal.

At the conclusion of the evidentiary hearing, the trial court ruled from the bench, ordering the forfeiture of Young's home and the 1997 Chevrolet Venture minivan. After Young appealed, the trial court issued a Pa.R.A.P. 1925(a) opinion. The opinion explained that the trial court based its findings of fact on the credited testimony of the Commonwealth's witnesses that a confidential informant or informants had purchased drugs "inside or around the property" and the vehicle; that police recovered paraphernalia from inside the house; that Graham retrieved drugs from the vehicle; and that there was marijuana on Graham's person when he was arrested. Trial Court Op. at 10. This evidence, the court concluded, established a nexus between the seized property and violations of The Controlled Substance, Drug, Device and Cosmetic Act (Drug Act), Act of April 14, 1972, P.L. 233, *as amended,* 35 P.S. §§ 780–101–780–144.

The trial court rejected Young's innocent owner defense. The trial court found that Young had knowledge of her son's "illegal activities" because the police informed her of this activity. Trial Court Op. at 11. Because Young did not evict Graham from her home, the trial court found that she consented to his conduct. At best, it explained, Young turned "a blind eye to her son's illegal conduct on the property," which constituted consent. Trial Court Op. at 14.

Finally, the trial court concluded that forfeiture of Young's house and vehicle did not violate the Eighth Amendment to the United States Constitution because it was not grossly disproportional to the gravity of Graham's offense. The trial court found it irrelevant that Young herself was not charged with or convicted of a violation of the Drug Act; the only relevant offense was that of her son, who theoretically could have faced criminal penalties of $80,000 for making the four sales of marijuana in December 2009 and January 2010.[8] This potential maximum penalty exceeded the combined values of the house and vehicle. Further, the trial court noted that narcotics had been sold from Young's home "for the past several years," beginning in November 2009 and ending in April 2011 with the Adams incident. Trial Court Op. at 14. The trial court also found that the neighbors and investigating officers had been placed "in harm's way"

---

**8.** In this regard, the trial court relied upon the statement of the Assistant District Attorney that Graham could have been fined the maximum of $15,000 for each of the four marijuana sales that took place in December 2009 and January 2010, for a total penalty of $60,000. N.T. 95–96. He also represented that a "person" involved in these controlled buys would be "charged with use of communication facility and K and I, which would add an extra $15,000 and an extra $5,000, coming to a grand total of $80,000." N.T. 96.

The dissent notes that the Commonwealth offered Graham's criminal history into evidence although it is missing from the certified record. Nevertheless, the Commonwealth did not identify how Graham was charged as a result of the seven controlled buys; his conviction; or his criminal penalty. Instead, it offered the trial court an abstraction, *i.e.,* the maximum sentence on hypothetical criminal charges for four of the controlled buys.

by the illegal conduct in or around Young's house. *Id.*

 Young appealed the forfeiture of her home and 1997 Chevrolet minivan to this Court.[9]

## Issues on Appeal

On appeal, Young raised two issues. First, she contended that the trial court erred in concluding that the forfeiture of her house and vehicle did not violate the Eighth Amendment to the United States Constitution. Second, she contended that the trial court erred in concluding that her son's sale of marijuana "inside or around" her house was done with her knowledge or her consent.

On October 8, 2013, a three-judge panel of this Court heard argument on Young's appeal. Thereafter, Young filed an application for extraordinary relief based upon the fact that Officer Jeffrey Walker, whose testimony had been credited by the trial court, had been indicted on corruption charges that involved his planting drugs on suspects.[10] Walker conducted the April 25, 2011, search of Young's house. At the forfeiture hearing, Walker stated that he was involved in a "prior" search where he saw Young. N.T. 51. The only search where Young was present was the one done on November 19, 2009. Young asserted that Walker's criminal charges tainted his testimony about the paraphernalia and "marijuana residue" he found in Young's basement. In addition, she ar-

gued that Walker's presence at Young's house on November 19, 2009, tainted that search as well. Fairness required a remand so that the trial court could reexamine its entire decision. The Commonwealth opposed Young's application for extraordinary relief, arguing that the testimony of Officers Billips and London about Graham's seven controlled buys was sufficient to warrant the forfeiture of Young's home.

On February 19, 2014, this Court issued an order listing Young's appeal for *en banc* oral argument. On February 26, 2014, this Court denied Young's application for extraordinary relief. Finally, on February 28, 2014, this Court issued an order directing the parties to be prepared to address the following issues at oral argument:

1. Should the Court decline to apply the current test for an "excessive fine" analysis where the property owner is not charged with a crime supporting forfeiture? If so, what test should be adopted?

2. Should the Court revisit its holding in *Commonwealth v. 542 Ontario St.,* 989 A.2d 411 (Pa.Cmwlth.2010) (*en banc*)?

3. Should the Court adopt a "clear and convincing evidence" burden in civil forfeiture cases? If so, in what circumstances would such a burden be appropriate?

The parties filed supplemental briefs and argued the case before an *en banc* panel of this Court on May 14, 2014. In addition,

---

9. In an appeal from a forfeiture proceeding, this Court reviews whether findings of fact made by the trial court are supported by substantial evidence, and whether the trial court abused its discretion or committed an error of law. *Commonwealth of Pennsylvania v. $11,600.00 Cash, U.S. Currency,* 858 A.2d 160, 163 n. 3 (Pa.Cmwlth.2004). Our standard of review is deferential with respect to the trial court's findings of fact. Whether the evidence, as a whole, is sufficient to support a

legal conclusion is a question of law. *Commonwealth v. Marshall,* 548 Pa. 495, 698 A.2d 576, 579 (1997). Our scope of review over questions of law is plenary. *Commonwealth v. Real Property and Improvements at 2338 N. Beechwood St.,* 65 A.3d 1055, 1059 n. 8 (Pa. Cmwlth.2013).

10. Walker has since been convicted.

the Pennsylvania Attorney General has filed an *amicus curiae* brief.

### Eighth Amendment

■ The Eighth Amendment of the United States Constitution limits the government's power to punish citizens by providing that:

> Excessive bail shall not be required, *nor excessive fines imposed,* nor cruel and unusual punishments inflicted.

U.S. CONST. amend. VIII (emphasis added). The central question in this appeal is whether the forfeiture of Young's home and vehicle imposed an excessive fine on her. Young argues that this forfeiture was grossly disproportional to the gravity of the offense, namely, her son's sale of "a small amount" of marijuana, as defined by statute, to a police informant. *See* 35 P.S. § 780–113(a)(31). She also argues that the focus should be on her conduct, not that of her son. The loss of her home, where Young has lived over 30 years, exacts a grossly disproportional punishment on her because she has not been charged with or convicted of an offense under the Drug Act. Given this lack of culpability, the confiscation of her home imposes an excessive fine on her. The Commonwealth responds that the relevant offense to consider is Graham's offense and the maximum penalties he could have faced.

### I.

We begin with a review of the United States Supreme Court precedent relevant to the Eighth Amendment's application to civil forfeiture. In *Austin v. United States,* 509 U.S. 602, 622, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993), the Supreme Court held that because a statutory *in rem* civil forfeiture imposes a "punishment for

some offense," it "is subject to the limitations of the Eighth Amendment's Excessive Fines Clause." At issue in *Austin* was the federal government's forfeiture of a mobile home and an auto body shop because their owner had engaged in illegal drug trafficking. The forfeitures were sought under the federal forfeiture statute at 21 U.S.C. §§ 881(a)(4) and (a)(7).[11] The government argued that the Eighth Amendment did not apply to a forfeiture proceeding because it is a civil proceeding. The Supreme Court held that because the purpose of the Eighth Amendment "was to limit the government's power to punish" by any means whether civil or criminal in nature, it applied to a civil forfeiture proceeding. *Austin,* 509 U.S. at 609, 113 S.Ct. 2801.

*Austin* also established that forfeitable property must be instrumental to the commission of the drug offense, and, if not, the forfeiture imposes an excessive fine. In *Austin,* the Supreme Court reflected on its earlier decision in *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965), that reversed the forfeiture of a vehicle. In that case, Pennsylvania failed to prove a crime, namely, possession of illegal liquor; accordingly, the Supreme Court held that the vehicle used to transport that liquor could not be forfeited. In *Austin,* the Supreme Court observed that the federal government's claim that the criminal defendant's auto body shop and mobile home were " 'instruments' of the drug trade must meet the same fate as Pennsylvania's efforts to characterize the 1958 Plymouth sedan as 'contraband.' " *Austin,* 509 U.S. at 621, 113 S.Ct. 2801. That fate was failure.

---

11. The federal statute is similar to Pennsylvania's Forfeiture Act. The federal statute provides for forfeiture of real property used to facilitate drug crimes punishable by more than one year of imprisonment and contains an innocent owner defense.

In *Austin*, the Supreme Court established that a forfeiture of property will violate the Eighth Amendment if it is not the instrumentality of the criminal offense. However, the Court did not agree on how to determine that a forfeiture is excessive where instrumentality is shown by the government. The *Austin* court declined the appellant's invitation to "establish a multifactor test for determining whether a forfeiture is constitutionally 'excessive,'" noting that it would "allow the lower courts to consider that question in the first instance." *Id.* at 622–23, 113 S.Ct. 2801.

■ Several years later, in *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), the Supreme Court established a multifactor test for determining excessiveness. Under this test, courts

must compare the amount of the forfeiture to the gravity of the defendant's offense. If the amount of the forfeiture is *grossly disproportional to the gravity of the defendant's offense*, it is unconstitutional.

*Id.* at 336–37, 118 S.Ct. 2028 (emphasis added). Notably, *Bajakajian* involved a criminal forfeiture statute, not a civil or *in rem* forfeiture, as was the case in *Austin*.

Hosep Bajakajian and his family booked a flight to Cyprus, by way of Italy, from Los Angeles International Airport. After customs inspectors discovered $230,000 in cash in Bajakajian's luggage, an inspector informed Bajakajian that he and his family were required by federal law to report all cash over $10,000 that they were transporting out of the country. Bajakajian responded that he had $8,000, and his wife had $7,000, and that the family had no other money to report. He lied. The inspectors found a total of $357,144 on the Bajakajians.

Bajakajian was indicted on two counts and pled guilty to one: failing to report his transport from the United States of more than $10,000 in cash, in violation of 31 U.S.C. § 5316(a)(1)(A).[12] He was sentenced to three years of probation and ordered to pay a fine of $5,000. The district court then conducted a bench trial on the government's request that all of the $357,144 seized from the Bajakajians be forfeited. The district court found that Bajakajian was using the cash to repay a debt and that the record lacked proof that the cash was obtained by illegal means. *Bajakajian*, 524 U.S. at 337–38, 118 S.Ct. 2028. Nevertheless, the operative statute made the entire $357,144 subject to forfeiture because it had been "involved in" the offense of failure to report.[13] Concluding that a forfeiture of that amount would be grossly disproportionate to Bajakajian's offense and, as such, unconstitutional, the

---

12. Section 5316(a)(1)(A) states in relevant part as follows:

(a) [A] person or an agent or bailee of the person shall file a report under subsection (b) of this section when the person, agent, or bailee knowingly—
(1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time—
(A) from a place in the United States to or through a place outside the United States[.]

31 U.S.C. § 5316(a)(1)(A).

13. Section 982(a)(1) was rewritten in 2001. At the time of Bajakajian's crime, Section 982(a)(1) stated, in relevant part, as follows:

*The court*, in imposing sentence on a person convicted of an offense in violation of section 5313(a), 5316, or 5324 of title 31, or of section 1956, 1957, or 1960 of this title, *shall order that the person forfeit to the United States any property, real or personal, involved in such offense*, or any property traceable to such property.

Former 18 U.S.C. § 982(a)(1) (emphasis added). Forfeiture for violating Section 5316 is now provided for at 31 U.S.C. § 5317(c).

district court ordered a forfeiture of $15,000.

The United States appealed. The Ninth Circuit used the excessive fines test it had formulated post-*Austin.* That test provided that a forfeiture would be upheld if:

(1) the property forfeited is an "instrumentality" of the crime committed; and (2) the value of the property is proportional to the culpability of the owner.

*United States v. Bajakajian,* 84 F.3d 334, 336 (9th Cir.1996). The Court of Appeals concluded that Bajakajian's cash was "involved" in the offense, which satisfied the statute at 18 U.S.C. § 982(a)(1). However, the cash was not an "instrumentality" of the crime, which was the withholding of information. Thus, any forfeiture would represent an unconstitutional excessive fine. Because Bajakajian had not cross-appealed, the court affirmed the forfeiture of $15,000. The United States Supreme Court granted *certiorari.*

The Supreme Court established "a standard for determining whether a punitive forfeiture is constitutionally excessive," stating:

We now hold that a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense.

*Bajakajian,* 524 U.S. at 334, 118 S.Ct. 2028. Accordingly, it instructed that courts "must compare the amount of the forfeiture to the gravity of the defendant's offense." *Id.* at 336–37, 118 S.Ct. 2028. The Supreme Court next addressed the question of how to measure the "gravity of the offense," against which the amount of the forfeiture is to be compared.

Bajakajian was fined $5,000 and sentenced to three years of probation. The maximum penalty under the federal statute was $250,000 and five years imprisonment, and the government argued that the maximum penalty is what established the gravity of his offense. The Supreme Court rejected this argument:

Here, as the Government and the dissent stress, Congress authorized a maximum fine of $250,000 plus five years' imprisonment for willfully violating the statutory reporting requirement, and this suggests that it did not view the reporting offense as a trivial one. That the maximum fine and Guideline sentence to which [Bajakajian] was subject were but a fraction of the penalties authorized, however, undercuts any argument based solely on the statute, because they show that [Bajakajian's] culpability relative to other potential violators of the reporting provision—tax evaders, drug kingpins, or money launderers, for example—is small indeed.

*Id.* at 339 n. 14, 118 S.Ct. 2028. Stated otherwise, the comparison of Bajakajian's actual criminal penalty, $5,000, and the maximum statutory penalty of $250,000, did not support the conclusion that his offense was grave.

The Supreme Court identified two other factors that must be considered in determining the gravity of the offense: whether the offense was isolated and the nature of the harm resulting from the offense. The Supreme Court concluded that because Bajakajian's failure to report affected only one party, the government, by depriving it of information, the harm was "minimal." *Id.* at 339, 118 S.Ct. 2028. Further, Bajakajian's failure to report was an isolated occurrence.

After considering all three factors, the Supreme Court compared the gravity of Bajakajian's offense to the amount of the forfeiture. It concluded:

Comparing the gravity of [Bajakajian's] crime with the $357,144 forfeiture the Government seeks, we conclude that

such a forfeiture would be grossly disproportional to the gravity of his offense. It is larger than the $5,000 fine imposed by the District Court by many orders of magnitude, and it bears no articulable correlation to any injury suffered by the Government.

*Id.* at 339–40, 118 S.Ct. 2028 (footnote omitted).

## II.

*Austin* and *Bajakajian* involved federal forfeiture statutes. *Austin* involved a civil *in rem* forfeiture under the federal drug forfeiture statute that is similar to Pennsylvania's Forfeiture Act. *Bajakajian* involved a criminal forfeiture statute that had nothing to do with drug law offenses. The Pennsylvania Supreme Court has made *Austin* and *Bajakajian* applicable to civil forfeitures brought under any of Pennsylvania's forfeiture statutes.

In *In re King Properties,* 535 Pa. 321, 635 A.2d 128, 133 (1993), the Pennsylvania Supreme Court considered, for the first time post-*Austin,* the "appropriate factors to consider" where a forfeiture is alleged to impose an excessive fine. Two police searches of King's house turned up cocaine, cash, a scale and paraphernalia, *i.e.,* items commonly used in the drug trade. These items were located throughout the house. King pled guilty to possession with intent to deliver cocaine, and this was followed by the forfeiture of King's house. In determining whether the forfeiture of King's house imposed an excessive fine, the Pennsylvania Supreme Court adopted the test announced in Justice Scalia's concurring opinion in *Austin.*[14] Accordingly,

it held that so long as the property "has a close enough relationship to the offense," the forfeiture of that property does not impose an excessive fine. *Id.* at 132 n. 10 (quoting *Austin,* 509 U.S. at 628, 113 S.Ct. 2801 (Scalia, J., concurring)). Stated otherwise, it held the property's value to be irrelevant. Our Supreme Court also quoted with approval Justice Scalia's cautionary note:

> But an in rem forfeiture goes beyond the traditional limits that the Eighth Amendment permits if it applies to property that cannot properly be regarded as an instrumentality of the offense—the building, for example, in which an isolated drug sale happens to occur. Such a confiscation would be an excessive fine.

*Id.* In short, *King Properties* established that a forfeiture violates the Eighth Amendment where the forfeitable property is not "an instrumentality of the offense," but if instrumentality is established, then the amount of the forfeiture is irrelevant.

Thereafter, in *Commonwealth v. Real Property and Improvements commonly known as 5444 Spruce Street,* 574 Pa. 423, 832 A.2d 396, 403 (2003), our Supreme Court adopted the *Bajakajian* gross disproportionality test. In doing so, it overruled *King Properties* to the extent that it had held that the amount of the forfeiture need not be considered. It made *Bajakajian* expressly applicable to civil forfeitures authorized by the Forfeiture Act. The history of *5444 Spruce Street* involved several appeals and remands.

As did *King Properties, 5444 Spruce Street* concerned the forfeiture of a house.

14. The Pennsylvania Supreme Court explained that

[w]here the evidence is that the criminal incident on which the forfeiture is based is not part of a *pattern of similar incidents,* there is no "significant" relationship be-

tween the property to be forfeited and the offense.

*King Properties,* 635 A.2d at 133 (emphasis added). To satisfy instrumentality, there must be a significant relationship between the forfeitable property and the drug offense.

Its owner, Elizabeth Lewis, was convicted of possession with intent to sell marijuana with a value of $80, for which offense she was fined $185 and sentenced to two years of probation. The trial court ordered the forfeiture of her Philadelphia home. After Lewis appealed, this Court remanded for the trial court to address Lewis' Eighth Amendment issue, directing, *inter alia*, a consideration of the evidence using the clear and convincing standard of proof. *Commonwealth v. Real Property and Improvements commonly known as 5444 Spruce Street*, 787 A.2d 1117, 1120 n. 4 (Pa.Cmwlth.2001) (*5444 Spruce Street I*).[15]

The trial court, on this first remand, held that the forfeiture did not violate the Eighth Amendment. This Court affirmed the trial court's application of the *Bajakajian* gross disproportionality test. Lewis appealed, and the Pennsylvania Supreme Court reversed and remanded. It held that "the Commonwealth Court gave lip service to the requirements of *Bajakajian*" but did not correctly apply its requirements. *5444 Spruce Street*, 832 A.2d at 402–03.

First, the Supreme Court held that this Court erred in applying the third prong of *Bajakajian*, *i.e.*, harm. We applied the "harm" test as follows:

Drug trafficking is a very serious crime.... *Lewis' crime endangered the neighborhood and the harm caused to society is self-evident.* Her admitted drug trafficking exacted a heavy toll from government resources and has wide ranging effects that weigh in favor of the forfeiture of her house.

*5444 Spruce Street I*, 787 A.2d at 1122 (emphasis added). The Pennsylvania Su-

preme Court held that this analysis was wrong because it "used the analytical framework which became the dissent in *Bajakajian*," *i.e.*, that the harm is self-evident by reason of the statute criminalizing an activity. Our Supreme Court instructed that courts must consider "the harm resulting from the crime charged" to establish the gravity of the specific offense on which the forfeiture is based. *5444 Spruce Street*, 832 A.2d at 402.

Second, the Supreme Court held that this Court erred because there was no evidence in the record of the value of Lewis' house. It explained that "[u]nless and until the value of 5444 Spruce Street is established, the proportionality of the fine to Lewis' offense cannot be established." *Id.* at 403.

The Supreme Court held that *Bajakajian's* "gross disproportionality test applies to all punitive forfeitures regardless of the form of the underlying proceedings." *Id.*[16] It summarized the *Bajakajian* test for measuring the gravity of the offense as follows:

[T]he penalty imposed as compared to the maximum penalty available; whether the violation was isolated or part of a pattern of misbehavior; and, the harm resulting from the crime charged.

*5444 Spruce Street*, 832 A.2d at 402 (citing *Bajakajian*, 524 U.S. at 338–39, 118 S.Ct. 2028). After the gravity of the offense is established, it must be compared to the amount of the forfeiture to complete the *Bajakajian* analysis. Acknowledging that courts had adopted different approaches to *Bajakajian's* excessive fines analysis, the Supreme Court advised as follows:

---

**15.** This first remand decision, *Commonwealth v. Real Property known as 5444 Spruce Street*, (Pa.Cmwlth., No. 903 C.D.1997, filed February 29, 2000), was not published. Its holding is summarized in footnote 4 of *5444 Spruce Street I*.

**16.** Accordingly, *Bajakajian* applies to Pennsylvania's Forfeiture Act.

*We do not here decide which approach is appropriate* because without a value for the Lewis house we do not know yet whether the forfeiture meets the threshold question of whether the forfeiture is grossly disproportionate, *nor has the question undergone the sharpening and annealing process of litigation in the lower courts.*

*5444 Spruce Street,* 832 A.2d at 402 n. 7 (emphasis added).[17]

At the remand hearing before the trial court, the Commonwealth's evidence established that Lewis' house was worth $25,000. On the first prong of the *Bajakajian* test, the trial court determined that the maximum penalty *on charges that could have* been brought against Lewis was a fine of $215,000 and incarceration for 25 years.[18] On the second and third prongs, the trial court found that for years Lewis' house had functioned as the neighborhood crack house and was used to sell a variety of narcotics to neighborhood teenagers. The trial court concluded that forfeiture of Lewis' house was not grossly disproportional to the gravity of the offense.

On appeal to this Court, Lewis argued that the trial court erred by evaluating the gravity of her offense on the basis of the maximum possible sentence on hypothetical charges that could have been filed but, apparently, were not. Lewis urged this Court to follow the lead of the Utah Supreme Court, which established that the actual penalty imposed must be compared to the maximum penalty authorized by statute for her conviction. *State of Utah v. Real Property at 633 East 640 North, Orem, Utah,* 994 P.2d 1254, 1261 (Utah 2000). This Court rejected Lewis' argument, stating:

> [I]n many cases, sentencing does not reflect the actual gravity of the defendant's conduct.... *The maximum penalty for an offense offers an accurate gauge of the gravity of the offense,* and, as noted by the Commonwealth, the forfeiture in this case, worth approximately 25 to 40 percent of the maximum fine, is clearly not grossly disproportional to the gravity of the offense.

*Commonwealth v. Real Property and Improvements commonly known as 5444 Spruce Street,* 890 A.2d 35, 40 (Pa.Cmwlth. 2006) *(5444 Spruce Street II )* (emphasis added). We affirmed the trial court.

---

17. One approach, adopted by some federal courts, holds "that if the value of forfeited property is within the range of fines prescribed by Congress, a strong presumption arises that a forfeiture is constitutional." *Id.* (citations omitted). Our Supreme Court described this approach as "more objective," but it did not endorse it as superior to other approaches. Further, this presumption would be invoked only after each of the steps required by *Bajakajian* were done to determine whether the forfeiture was disproportional to the offense.

18. Bajakajian was charged with two criminal offenses, *i.e.,* making a false statement to the U.S. Customs Service and transporting more than $10,000 outside the United States. He was convicted of the charge of transporting more than $10,000 outside the United States

by a guilty plea. *Bajakajian,* 524 U.S. at 324, 118 S.Ct. 2028. The Supreme Court rejected the government's argument that the maximum available penalty, as opposed to his actual penalty, should be dispositive. It gave no weight whatsoever to his second criminal charge, which was dropped, in its excessive fines analysis. To use hypothetical charges lacks any support in *Bajakajian.* It appears to have been done in *5444 Spruce Street* because the maximum penalty on Lewis' conviction was low, *i.e.,* $5,000, far below the value of her house.

In *Bajakajian,* criminal charges that were filed but did not result in a conviction received no consideration or weight. *A fortiori,* criminal charges that could have been filed, but were not filed, should receive no consideration or weight.

In his dissent, Judge Pellegrini (now President Judge) urged a "more objective approach" that would consider both the maximum statutory penalty and the actual penalty imposed. *Id.* at 44. The maximum fine for the drug offense to which Lewis pleaded guilty was $5000, but she was sentenced to pay $185. The dissent viewed the calculation of the maximum penalty on criminal charges that *could have been brought* as simply not relevant. The dissent concluded that the forfeiture of Lewis' house, worth $25,000, was grossly disproportional to the gravity of her offense.

## III.

■ *Bajakajian* did not overrule *Austin* for civil *in rem* forfeitures; it simply clarified that instrumentality is not a consideration in criminal forfeitures.[19] In *5444 Spruce Street,* our Supreme Court overruled *King Properties,* but only to the extent it had held that the amount of forfeited property did not matter in determining whether a forfeiture violates the Eighth Amendment. In sum, for a civil forfeiture brought under the Forfeiture Act to survive an Eighth Amendment challenge, the Commonwealth must show, initially, that the forfeitable property was the instrumentality of the offense. Next, where instrumentality is established, the court must then be persuaded that the amount of the forfeiture, or punishment, is proportional to the gravity of the offense, which is determined by using the three-prong *Bajakajian* test.

The question of whether this Court should revisit its prior precedent on the *Bajakajian* test has been briefed and argued. This case presents the opportunity for the "sharpening and annealing" of the

method for establishing the gravity of the offense. *5444 Spruce Street,* 832 A.2d at 402 n. 7. This case also provides the opportunity to consider the difficult question of how to apply *Bajakajian* where, as here, the owner of the forfeited property has not been charged with or convicted of a drug offense.

## Trial Court Application of *Bajakajian* Three–Prong Test

At the hearing on the forfeiture of Young's property, the Commonwealth did not specify Graham's criminal charges or his actual sentence for participating in the controlled buys. In his argument to the trial court, the Assistant District Attorney summarized the first prong for establishing the gravity of the offense as follows:

> With regard to the first prong of the test, it's a comparison, quite frankly, between the value of the property, as well as a maximum fine available.

N.T. 95. He then described what "could have been charged" for Graham's "four actual sales, possession with intent to distribute" and came up "with $60,000 as the maximum fine," to which $20,000 was added for Graham's use of a cellphone to commit the offense. *Id.* at 96. This analysis misstates the law.

■ The first prong is not a comparison of the "value of the property" to the "maximum fine available." In *5444 Spruce Street,* 832 A.2d at 402, our Supreme Court stated that the first prong of the *Bajakajian* test compares the *actual penalty* to the *maximum penalty available.* Without information on Graham's actual criminal penalty, the first prong analysis cannot be done. The amount of the forfeiture comes into play only after the gravity of the

---

**19.** Nevertheless, it agreed with the Court of Appeals that Bajakajian's cash was not the "instrumentality" of his reporting offense.

*Bajakajian,* 524 U.S. at 334, n. 9, 118 S.Ct. 2028.

offense is established. Because Graham's actual penalty for participating in the controlled buys was not identified, the trial court erred on the first prong for determining the gravity of the offense.

With respect to the third prong, harm, the Assistant District Attorney offered the following argument:

> Case law—appellate case law has already pointed out that narcotics sales in and of itself [are] harmful to the community.

N.T. 97. This argument also misstates the law.

■ The third prong for establishing the gravity of the offense requires evidence specific to the offense. In *5444 Spruce Street I,* 787 A.2d at 1122, we held that

> Lewis' crime endangered the neighborhood and the harm caused to society is self-evident.

The Pennsylvania Supreme Court rejected this analysis and held that we erred. As a general proposition, any violation of a criminal law harms society in some respect, which was the point of the dissent in *Bajakajian.* This is not enough to satisfy the *Bajakajian* "harm" prong; rather, there must be evidence about the harm caused by the particular offense.

After Lewis' appeal was remanded for the second time to the trial court, the Commonwealth produced evidence specific to Lewis' offense. This evidence showed that Lewis' home had served, for years, as the neighborhood crack house and that Lewis herself had sold marijuana and cocaine to undercover officers and to neighborhood teenagers. A juvenile, Tarik Chapman, testified that he and his friends purchased illegal drugs from Lewis at her home several times a week. Chapman purchased the drugs from Lewis' daughter when Lewis was not home. This is the evidence that determined the harm for purposes of the gravity of Lewis' offense. *5444 Spruce Street II,* 890 A.2d at 37, 39–40.

In this case, to the extent the Commonwealth believes that its approach to the first prong of the *Bajakajian* test was directed by this Court in *5444 Spruce Street II,* it is mistaken. This Court lacked the authority to overrule the Supreme Court's holding in *5444 Spruce Street,* 832 A.2d at 402, on how to establish gravity of the offense, and it did not do so. The maximum available criminal penalty is a consideration, but it must be compared to the actual criminal penalty. In *Bajakajian,* the United States Supreme Court expressly rejected the concept that the maximum criminal penalty is dispositive on the first prong, as had been proposed by the government. *Bajakajian,* 524 U.S. at 339 n. 14, 118 S.Ct. 2028. There must be evidence of the actual penalty imposed on the defendant.

Likewise, to the extent the Commonwealth believes it did not need to present evidence on the specific harm caused by Graham's sale of marijuana to an informant, it is again mistaken. *5444 Spruce Street II* did not affirm the trial court on prong three of *Bajakajian* because the harm was "self-evident." Rather, it affirmed on the basis of the extensive evidence that Lewis' house functioned as a store for the purchase of marijuana and cocaine. It was the neighborhood crack house.

### 542 Ontario Street

*Bajakajian* involved a federal criminal forfeiture statute. Nevertheless, our Supreme Court has made the *Bajakajian* gross disproportionality test applicable to every type of civil *in rem* forfeiture. *See also* 18 U.S.C. § 983(g)(2) (making the *Bajakajian* gross disproportionality standard

applicable to all federal civil forfeitures); Yan Slavinskiy, *Protecting the Family Home by Reunderstanding United States v. Bajakajian*, 35 CARDOZO L. REV. 1619, 1620 (2014) (*Bajakajian* "establish[ed] a framework for evaluating when a criminal or civil forfeiture constitutes an excessive fine in violation of the Excessive Fines Clause of the Eighth Amendment."). In *Commonwealth v. 542 Ontario Street, Bethlehem, PA*, 989 A.2d 411 (Pa.Cmwlth. 2010), we considered the challenge of how to apply the Bajakajian analysis where the owner of the property has not been convicted of a crime but, in fact, acquitted. We concluded that where the evidence in a civil forfeiture proceeding shows the commission of an offense by the owner, his property can be forfeited in spite of the owner's acquittal on the criminal charges.

In *542 Ontario Street*, a jury, using the standard of proof for a civil case, found that Freddie Blas, the owner of a house, had conspired with his tenant to possess drugs with intent to deliver.[20] The trial court ordered the forfeiture of Blas' house. On appeal, Blas argued that the forfeiture violated the excessive fines clause of the Eighth Amendment. He argued, first, that the Commonwealth did not prove that his house was the instrumentality of his tenant's drug offense.[21] Second, he argued that the Commonwealth did not prove that the value of his house bore a "proportional relationship to the culpability of the owner." *Id.* at 417.

In applying *Bajakajian*, we recited the test as follows:

> *First, we compare the penalty imposed by the forfeiture against the maximum penalty available for conspiracy to pos-*

*sess cocaine with intent to deliver.* We discern no error in the trial court's determination that the value of the house, $65,000, is not grossly disproportionate to the maximum penalty for the conspiracy, $100,000.

We next consider whether Blas' violation was isolated or part of a pattern of misbehavior. The trial court accepted as credible evidence adduced at the criminal trial indicating the Bethlehem Police employed multiple resources and various countermeasures to combat illegal activity at Blas' property. These included numerous controlled purchases at the property. As Blas does not dispute that these findings are supported by substantial evidence, we perceive no error in the trial court's conclusion that Blas' violation was part of a pattern of misbehavior.

*Finally, we evaluate the harm resulting from Blas' conduct.* The trial court, quoting this Court, acknowledged that the harm caused to society by drug trafficking is self-evident. Also, the trial court found that Blas' property exacted a heavy toll from government resources, including the countermeasures employed by the Bethlehem Police over a one year period. Further, relying on the civil jury's findings, the trial court found the harm resulting from Blas' property was widespread.

*Id.* at 419 (emphasis added). There are two problems in this summary that require correction and clarification.

First, the "penalty" in the first prong is the criminal penalty imposed for the offense, not the amount of the forfeiture. The penalty analysis is used to determine

---

**20.** The trial court did not identify what provision of the Pennsylvania Crimes Code was violated by Blas. It did not explain how the evidence in the forfeiture proceeding · met each element of criminal conspiracy.

**21.** This Court did not address Blas' argument that his house was not the instrumentality of his tenant's drug offense.

the gravity of the offense. Only after the gravity is established does the amount of the forfeiture become relevant. In fact, the comparison of the amount of the forfeiture to the gravity of the offense is the last step in the gross disproportionality analysis. *Bajakajian,* 524 U.S. at 338–39, 118 S.Ct. 2028. The first prong compares "the [actual] penalty imposed to the maximum penalty available." *5444 Spruce Street,* 832 A.2d at 402.[22]

■ No criminal penalty was imposed on Blas. Accordingly, this Court made the amount of the forfeiture a substitute for that part of the first prong. Where there is no actual penalty, the Commonwealth can prove, using a civil standard of proof, an offense of the Drug Act and the likely penalty that would have been imposed.[23] This is not so hard. In Blas' case, the

Commonwealth could have offered evidence on a likely penalty, *i.e.,* penalties that have been imposed in the past for a violation of the Drug Act.[24] Likely penalty is not the maximum penalty on every possible criminal charge. The owner can rebut the Commonwealth's evidence on likely penalty.[25] The likely penalty can then be compared to the maximum penalty. This approach is required under *Bajakajian* because the whole purpose of the exercise is to consider the gravity of the particular offense that underlies the forfeiture, not the offense in the abstract.

Second, the above-quoted summary from *542 Ontario Street* notes that the trial court quoted our statement in *5444 Spruce Street I* that harm to society caused by drug trafficking is self-evident. The trial

---

**22.** This dissent argues that doing "one comparison sooner rather than later did not threaten an unfair result." Dissenting op. at 881. Actually, it did. The whole point of the *Bajakajian* exercise is to determine whether the amount of the forfeiture is disproportional when compared to the gravity of the offense. The syllogism falls apart if the forfeiture amount is used to determine the gravity of the offense.

**23.** *Stare decisis* teaches that as a general rule courts "stand by things decided" and do not disturb settled points of law. *Gardner v. Consolidated Rail Corporation,* 524 Pa. 445, 573 A.2d 1016, 1018 (1990). However, *stare decisis* does not preclude a court from overturning its own prior holdings where they are incorrect. As the United States Supreme Court has explained:

[W]hen convinced of former error, this Court has never felt constrained to follow precedent. In constitutional questions, where correction depends upon amendment and not upon legislative action this Court throughout its history has freely exercised its power to reexamine the basis of its constitutional decisions. This has long been accepted practice, and this practice has continued to this day. This is particularly true when the decision believed erroneous is the application of a constitutional

principle rather than an interpretation of the Constitution to extract the principle itself.

*Smith v. Allwright,* 321 U.S. 649, 665, 64 S.Ct. 757, 88 L.Ed. 987 (1944) (internal footnotes omitted). Accordingly, the Supreme Court does not hesitate to overrule "governing decisions [that] are unworkable or are badly reasoned." *Vieth v. Jubelirer,* 541 U.S. 267, 306, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004).

**24.** Section 6801(a)(6)(i)(C) of the Forfeiture Act states that real property may be forfeited if it is "used or intended to be used to facilitate *any violation* of the Controlled Substance, Drug, Device and Cosmetic Act[.]" 42 Pa.C.S. § 6801(a)(6)(i)(C) (emphasis added). To support a forfeiture of real property, there must be an actual violation of the Drug Act by someone.

It is by no means clear that Blas' conspiracy to possess and deliver cocaine was, in itself, a violation of the Drug Act. The better course may have been for the Commonwealth to use the offense of Blas' tenant, who apparently did violate the Drug Act, for purposes of the Eighth Amendment analysis.

**25.** Discovery under the Pennsylvania Rules of Civil Procedure is available. *See Commonwealth v. 605 University Drive,* —— Pa. ——, 104 A.3d 411 (2014).

court in *542 Ontario Street* failed to recognize that the Pennsylvania Supreme Court had rejected this quoted analysis as not consistent with *Bajakajian.* Notwithstanding that error, the correct approach to the harm inquiry was undertaken in *542 Ontario Street* because the trial court made specific reference to the evidence that related to the specific harm resulting from the illegal use of Blas' property.[26]

In sum, the amount of the forfeiture, *i.e.,* the value of the property, is not the "penalty" for purposes of the first prong of the gravity of the offense test. Only after the gravity of the offense is established does the court compare the amount of the forfeiture to the gravity of the offense. Further, there must be evidence on the harm specific to the proven offense.

*Bajakajian* requires more than an arithmetic calculation; it requires the exercise of discretion and judgment. The harm may be proven to be so substantial, as it was in *5444 Spruce Street II,* that a forfeiture may not be grossly disproportional even if the amount of the forfeiture exceeds the amount of the criminal penalty.

### Instrumentality

Young argues that instrumentality must be considered whenever a civil *in rem* forfeiture is challenged under the Eighth Amendment, as was established in *Austin* and in *King Properties.*[27] We agree.

■ As noted, *Austin,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488, established that where property has not been shown to be the instrumentality of the commission of the drug offense, its forfeiture violates the Eighth Amendment's prohibition of excessive fines. Precedent from other jurisdictions offers instructions on how to determine whether forfeited property has been instrumental to the offense. In *United States v. Chandler,* 36 F.3d 358, 365 (4th Cir.1994), the Fourth Circuit Court of Appeals identified the relevant considerations as follows:

> (1) whether the use of the property in the offense was deliberate and planned or merely incidental and fortuitous; (2) whether the property was important to the success of the illegal activity; (3) the time during which the property was illegally used and the spacial extent of its use; (4) whether its illegal use was an isolated event or had been repeated; and (5) whether the purpose of acquiring, maintaining or using the property was to carry out the offense.

Stated otherwise, instrumentality considers

> the relationship between the property and the offense, including whether use of the property in the offense was (a) important to the success of the illegal activity, (b) deliberate and planned or merely incidental and fortuitous, and (c) temporarily or spatially extensive[.]

*United States v. Milbrand,* 58 F.3d 841, 847 (2d Cir.1995). *See also, e.g., United States v. 6625 Zumirez Drive,* 845 F.Supp. 725, 732 (C.D.Cal.1994) (considering whether the property was an integral part of the commission of the crime and whether the criminal activity involving the defendant property was extensive in terms of time and/or spatial use).

---

**26.** By contrast, in the case of Young's house, the Commonwealth presented no evidence on harm. It relied on the self-evident harm analysis overruled by the Supreme Court.

**27.** The dissent contends that Young did not raise this "issue." The "issue" in this appeal

is what the Eighth Amendment requires of a government's civil forfeiture of property. Young argued that instrumentality of the property and culpability of the owner must be considered. *See* Young's Supplemental Brief at 7–11, 15–16.

In *Bajakajian*, the United States Supreme Court explained that the instrumentality test announced in *Austin* was appropriate for an *in rem* civil forfeiture case but not for the criminal forfeiture statute that was the subject of *Bajakajian*. Nevertheless, it agreed with the Ninth Circuit Court of Appeals that Bajakajian's cash was not the instrumentality of his failure to report offense; rather, it was simply the "subject of the crime of failure to report." *Bajakajian*, 524 U.S. at 334 n. 9, 118 S.Ct. 2028. Our Supreme Court has overruled *King Properties*, but only to the extent it had directed that proportionality is not part of the Eighth Amendment inquiry. The requirement established in *King Properties* that the forfeitable property must be instrumental to the offense remains good law.

■ The purpose of forfeiture is to make unavailable "the instrumentalities used to facilitate criminal activity and thus attempts to prevent future criminal activity." Barclay Thomas Johnson, *Restoring Civility—the Civil Asset Forfeiture Reform Act of 2000: Baby Steps Towards a More Civilized Civil Forfeiture System*, 35 IND. L. REV. 1045, 1068 (2001–2002). Where the property to be forfeited is a home, forfeiture is not readily granted. As explained in *United States v. Certain Lots in City of Virginia Beach, Virginia*, 657 F.Supp. 1062, 1065 (E.D.Va.1987),

> courts have traditionally drawn a distinction between one's personal property and one's home, according the latter far greater protection under the law.

Indeed, this Court has observed that it "is difficult to imagine a more punitive result than the forfeiture of one's home and personal residence[.]" *Commonwealth v. Real Property and Improvements at 2338 N. Beechwood Street*, 65 A.3d 1055, 1065 (Pa.Cmwlth.2013).[28]

■ The Utah Supreme Court has held:

> [T]he threshold test in real property forfeitures is whether the defendant property is an instrumentality of the offense. If instrumentality is proven, we must then examine whether the ordered forfeiture is "grossly disproportionate" to the offense.

*Real Property at 633 East 640 North*, 994 P.2d at 1257 (internal footnote omitted). This approach embodies the principles announced by the United States Supreme Court in *Austin* and *Bajakajian*, and by our Supreme Court in *King Properties* and *5444 Spruce Street*. Instrumentality is the threshold inquiry in determining whether an *in rem* civil forfeiture violates the Eighth Amendment.

### Young's Culpability

Young argues that because forfeiture punishes the owner of the confiscated property, it is necessary to establish the owner's culpability. *Austin*, 509 U.S. at 617, 113 S.Ct. 2801. Usually, the owner and the offender are one and the same. Indeed, Young notes that in Pennsylvania there has never been a forfeiture of a house where the owner had not been the person who committed the violation of the Drug Act. By contrast, here, Young was

---

**28.** The federal forfeiture act limits forfeiture of real property to situations where the drug offense is "punishable by more than one year's imprisonment." 21 U.S.C. § 881(a)(7). Utah's forfeiture statute prohibited forfeiture of property used to store illegal drugs unless "cumulative sales of controlled substances on the property within a two-month period to-

tal[ed] or exceed[ed] $1,000, or the street value of any controlled substances found on the premises at any given time total[ed] or exceed[ed] $1,000." Former Utah Code Ann. § 58–37–13(1)(iii). Pennsylvania's Forfeiture Act lacks these limitations upon forfeiture of real property.

not charged with any criminal offense, let alone a violation of the Drug Act. She contends that the owner's culpability must be considered in any excessive fine analysis.

Culpability is not a novel concept. Justice Kennedy anticipated the culpability issue in his concurring opinion in *Austin*, noting that

> [a]t some point, we may have to confront the constitutional question whether forfeiture is permitted when the owner has committed no wrong of any sort, intentional or negligent. That for me would raise a serious question.

*Austin*, 509 U.S. at 629, 113 S.Ct. 2801 (Kennedy, J., concurring). In *2338 N. Beechwood Street*, 65 A.3d at 1066, this Court observed that the "constitutional boundaries" of a civil forfeiture "become more apparent where there is no alleged criminal conduct of the homeowner." In *United States v. Chandler*, 36 F.3d at 364, the Fourth Circuit Court of Appeals held that the owner's culpability must be considered in determining whether a forfeiture imposes an unconstitutional excessive fine.

■ The Commonwealth rejoins that Young's culpability is irrelevant because a forfeiture proceeding is about the criminal use of property, an *in rem* analysis, not about the property owner's conduct. The Commonwealth dismisses Young's argument as nothing more than a "super-innocent-owner defense." Commonwealth's Brief at 20. The Commonwealth conflates the statutory defense with the constitutional defense. It fails to recognize that a forfeiture that meets the statutory requirements may, nevertheless, violate the Excessive Fines Clause of the Eighth Amendment, as was the case in *Bajakajian*.

Historically, in an *in rem* civil forfeiture proceeding, the property itself is the offender. The criminal offense "is attached primarily to the thing . . . independent of, and wholly unaffected by any criminal proceeding *in personam*." *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 684, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974) (quoting *The Palmyra*, 12 Wheat. 1, 25 U.S. 1, 9, 6 L.Ed. 531 (1827)). Stated otherwise, civil forfeiture embodies the "fiction that the thing is primarily considered the offender." *Austin*, 509 U.S. at 615, 113 S.Ct. 2801. In *Austin*, the Supreme Court exposed, and rejected, the fiction that the state's confiscation of property is wholly remedial and not punitive.

■ Pennsylvania's Forfeiture Act gives an owner the opportunity to prevent a forfeiture of his property that has been put to criminal use without the owner's knowledge or consent. 42 Pa.C.S. § 6802(j). However, this statutory defense and the Eighth Amendment defense to a forfeiture are separate and distinct. One may lose the innocent owner defense but win on the Eighth Amendment defense. This is because the owner, albeit not "innocent" within the meaning of the Forfeiture Act, may suffer an excessive fine where the forfeiture is disproportional to the owner's culpability. Accordingly, the owner's culpability must be established and evaluated whenever his property is forfeited.

The case *von Hofe v. United States*, 492 F.3d 175 (2d Cir.2007), is instructive on how to determine the culpability of a property owner who is not the perpetrator of the criminal conduct that prompts the forfeiture. In that case, police found 65 marijuana plants being cultivated in the basement of the home of Mr. and Mrs. von Hofe. Mr. von Hofe used some of the marijuana for his own enjoyment, and on occasion he sold or bartered the marijuana. The State of Connecticut charged both the von Hofes with drug offenses.

Mr. von Hofe pled guilty to manufacture and distribution of a controlled substance, and Mrs. von Hofe pled guilty to possession of a controlled substance. Both received suspended sentences.

After the von Hofes settled with the State of Connecticut, the federal government instituted a forfeiture action against the von Hofes' home. Mrs. von Hofe asserted an innocent owner defense, but the jury rejected it. The district court then concluded that forfeiture of the house, worth $248,000, did not impose an excessive fine on her.

The Second Circuit Court of Appeals upheld the forfeiture of Mr. von Hofe's one-half interest in the house, but it reversed and remanded with respect to Mrs. von Hofe's interest. The Court cautioned that the forfeiture required a "close consideration" because it would "amount to an eviction" of Mrs. von Hofe from her home. *von Hofe*, 492 F.3d at 188. The Court further explained that determining "the excessiveness of a civil *in rem* forfeiture is necessarily fact-intensive." *Id.* at 186. Finally, it noted that "a formula for an excessive fine [cannot be established] with surgical precision." *Id.*

The Court of Appeals acknowledged that a civil forfeiture is not dependent on a criminal conviction or even the commencement of criminal proceedings against the owner of the property. In such a case, the court must consider the criminal offense of the non-owner. Stated otherwise, the criminal activity connected with the forfeitable property, regardless of the perpetrator, must be considered. However, the owner's "culpability" for the perpetrator's offense must also be considered. *Id.* at 185. The Court explained:

> The government seeks to punish a claimant through forfeiture for criminal conduct he or she let transpire on the property. Building on the instrumentality principle discussed previously, the extent of the property's involvement in the offenses may prove relevant when evaluating a claimant's culpability. *The extent to which a property owner allowed or put the property to its criminal use may be indicative of his or her culpability.*

*Id.* (internal citations omitted) (emphasis added).

In the case of the von Hofes, the Court used Mr. von Hofe's cultivation and distribution of marijuana as the offense to consider in its excessive fines analysis. The Court rejected Mrs. von Hofe's argument that her minor marijuana conviction should be the operative offense. With respect to Mrs. von Hofe, the evidence showed that she knew that her husband was growing marijuana plants in their home, but she did not know that he was distributing marijuana to others. In short, she did not know "the full extent of criminal activity occurring on the property." *Id.* at 189. The Court found that Mrs. von Hofe bore "minimal blame" for the criminal activity at her house done by her husband. The Court observed that

> Mrs. von Hofe's culpability, falling at the low end of the scale, is best described as *turning a blind eye* to her husband's marijuana cultivation in their basement.

*Id.* (emphasis added).

On these facts, the Court of Appeals held that forfeiture of Mrs. von Hofe's half interest in the house would impose an excessive fine for her "minimal culpability." *Id.* at 191. The Court remanded for a determination of what amount of her interest in the house, if any, Mrs. von Hofe should forfeit, given her minimal culpability of "turning a blind eye." [29]

---

**29.** The dissent distinguishes *von Hofe* because

Mrs. von Hofe was convicted of a drug of-

■ We agree that the property owner's culpability must be considered before it can be determined that the forfeiture of that property punishes the owner within the limits of the Eighth Amendment. Further, we adopt the framework established by the Second Circuit Court of Appeals in *von Hofe*.[30] The relevant offense is the offense associated with the property for which the Commonwealth is seeking forfeiture. Where the perpetrator of the offense is not the property owner, the property owner's culpability must be evaluated by his own knowledge and actions, not the knowledge and actions of the wrongdoer.[31] There must be some evidence that the owner participated in the offense to a degree sufficient to justify the

amount of the Commonwealth's proposed forfeiture.

### Remand to the Trial Court on Eighth Amendment

■ Because we reject the gravity of the offense analysis used by the trial court in the forfeiture of Young's property, we reverse the trial court's holding. The determination of the gravity of Graham's offense must be conducted in accordance with the principles we have identified above. The trial court's forfeiture must also be reversed because it did not consider whether Young's house and vehicle were the instrumentality of Graham's offense and because it did not consider Young's culpability for Graham's violation of the Drug Act. In accordance with these

fense. Nevertheless, her culpability was held to be not sufficiently grave to warrant the forfeiture of her one-half interest in the house. The *von Hofe* court did not rule out the possibility of some forfeiture. In any case, the *von Hofe* analysis, not its discrete application, is what the majority cites with approval.

Young has not been charged or convicted of even a minor offense.

30. The dissent points out that *von Hofe* reached a different conclusion than was reached in *Milbrand*, 58 F.3d 841. In assessing the mother's degree of culpability, the *Milbrand* court stated in relevant part as follows:

> Finally, as to the role of [the mother], though she was not prosecuted for or convicted of any offense, the court's findings plainly indicated that she had a *significant degree of culpability* in the criminal use of the property. The court found that [the mother] "would have to have been blind not to have been aware of her son's marijuana activities, or would have to have consciously and purposefully ignored signs of such activities," and it found that her testimony that she was not aware was "simply not credible." Decision at 21. Those findings are amply supported not only by the evidence of [the mother's] frequent visits to the property, the proximity of numerous plants to the house, and her forays into cabinets and drawers where marijuana and

drug paraphernalia were found, but also by the evidence relating to [her son's] previous arrest for growing marijuana while living in [the mother's] own residence.... Admittedly aware of [her son's] involvement in growing marijuana, she proceeded to buy him a farm.

*Id.* at 848 (emphasis added). He used the farm to develop an "advanced drug enterprise." *Id.* at 841.

*Milbrand* does not stand for the proposition that any owner who is "blind" to any degree to criminal activities on her real property bears a "significant degree of culpability" for them. The facts of every case will be different. In *Milbrand*, the son was conspicuously using the entire property to grow and store marijuana. The Second Circuit Court of Appeals used the same analytical framework in both *Milbrand* and *von Hofe*.

31. In the case of Blas' house at 542 Ontario Street, the relevant offense was that of Blas' tenant. If Blas' culpability for that offense were significant, the forfeiture of Blas' house would not impose an excessive fine. In any civil forfeiture of real property, there must be an underlying violation of the Drug Act. Section 6801 of the Forfeiture Act permits the forfeiture of real property that has been used to commit or facilitate "the commission of a violation of [the Drug Act]." 42 Pa.C.S. § 6801(a)(6)(i)(C).

determinations, we remand. Our instructions on this remand follow.[32]

At the outset, as the parties agree, Officer Jeffrey Walker's testimony cannot be used to support the Commonwealth's forfeiture petition, which means that on remand the events of April 2011 involving Baron Adams must be excluded from any consideration. Young's application for extraordinary relief also asserted that Walker participated in the November 19, 2009, search of Young's house, and the Commonwealth's answer did not deny this claim. As a result of Walker's conduct, the District Attorney has requested that 53 narcotics convictions based on Walker's testimony be reversed. Application for Extraordinary Relief, ¶ 28. The trial court must make factual findings on the extent of Officer Walker's involvement in the November 19, 2009, search of Young's home and whether the results of that search should be stricken from the record.

### i.

With respect to the gravity of Graham's offense, additional evidence is needed. This relates to all three prongs. The proportionality analysis then follows.

On the first prong, the Commonwealth must present evidence on Graham's actual criminal history as it relates to the controlled buys. The Commonwealth must provide the trial court information on the actual charges filed against Graham; the actual penalty imposed; and the maximum penalty on the charges for which Graham was convicted as a result of the controlled buys set up by the Narcotics Field Unit.

■ On the second prong, "pattern of misbehavior," the trial court found that Young's house had been used for "years" for illegal purposes. This finding needs to be revisited because it included the 2011 incident, which was based entirely upon Officer Walker's testimony. The trial court should consider whether Graham's conduct was extensive in space and time. *Milbrand*, 58 F.3d at 847. Further, the Commonwealth must relate Graham's misbehavior to Young's house and show how the two are related. A single incident of "misbehavior" in Young's house or in her car does not demonstrate a pattern. *Bajakajian*, 524 U.S. at 337–39, 118 S.Ct. 2028.[33] According to London's testimony, the one time the informant actually crossed the threshold of Young's home he received "alleged marijuana" from Graham. The trial court must also consider to what extent Graham's "pattern of misbehavior" was a construct of the Narcotics Field Unit, which chose to send its informant to Young's house, instead of to another location for the controlled buys.

■ On the third *Bajakajian* prong, *i.e.*, the harm caused by Graham's marijuana sales, the record lacks sufficient evidence. As a threshold matter, the Commonwealth did not establish the amount of marijuana, by gram or by dollar value, that was involved in the controlled buys set up

---

**32.** The dissent complains that the majority has undone several of the trial court's factual findings. Dissenting op. at 884. The majority does so where a finding has been based on Officer Walker's testimony, such as the finding that the illegal use of Young's house lasted "years." The majority also rejects findings not supported by substantial evidence, such as the finding that the neighborhood and police were "in harm's way." The Commonwealth offered no evidence whatsoever about the criminal activity in the neighborhood or the purported risks to the members of the Narcotics Field Unit, whose sting operation took place in daylight hours or early evening. The factfinder may use reasonable inference, but there must be evidence in the record from which to draw the inference.

**33.** Likewise, it does not prove instrumentality. *Austin*, 509 U.S. at 628, 113 S.Ct. 2801.

by the Narcotics Field Unit. The evidence did not even confirm that marijuana was involved in all sales. The packet involved in the sixth transaction was described as containing "alleged marijuana." N.T. 20. There are conflicts in the evidence. Billips testified that in the first transaction in November of 2009, the informant received four grams of confirmed marijuana in exchange for $40. Officer London testified that 1.3 grams would sell for $20–$25 in Philadelphia. These two accounts of the value of approximately one gram of marijuana cannot be reconciled. Using Officer Billips' testimony that one gram sells for $10, then it can be calculated that Graham sold a total of 19 grams of marijuana, with a value of $190, in the seven controlled buys on which testimony was presented by the Commonwealth. Harm considers .the type of drugs sold as well as their quantity. *Cf. 5444 Spruce Street II,* 890 A.2d at 37, 39–40 (holding that using real property as a safe house for regular sales of hard drugs and marijuana to minors constituted a substantial harm).

Although the Narcotics Field Unit had to go to the trouble of putting together the controlled buys, no one actually used illegal drugs as a result of its sting operation. Young's neighbor, who is part of the neighborhood watch, never saw or heard anything about Young's property being used to sell drugs. The trial court disregarded, without comment, this evidence. The trial court found that Graham's use of his mother's house put both his neighbors and investigating officers "in harm's way," but these findings lack any support in the record. Trial Court Op. at 13. In place of evidence, the trial court employed the "self-evident" analysis rejected by our Supreme Court in *5444 Spruce Street,* 832 A.2d at 402.

The trial court must give close consideration to the evidence presented by both sides on all three prongs. Then, the trial court must make a judgment about the seriousness of Graham's offense. In the final step, the trial court must consider the amount of forfeiture, *i.e.,* Young's house and vehicle, and determine whether this confiscation is proportional to the gravity of Graham's offense.

#### ii.

We also remand for a decision on whether Young's house was the "instrumentality" of Graham's controlled drug buys.[34] Two searches of Young's house, which included punching holes in the wall, uncovered two small packages of marijuana in the dining room and 1.3 grams of "loose marijuana." In the January 7, 2010, search, police found 8.5 grams of marijuana in the vehicle. The Drug Act defines a "small amount" of marijuana as 30 grams.

---

34. As noted, the Forfeiture Act permits the forfeiture of real property and vehicles that have been used "to facilitate" the commission of a violation of the Drug Act. 42 Pa.C.S. § 6801(a)(6)(i)(C), § 6801(a)(4). Some jurisdictions construe "facilitate" as synonymous with "instrumentality." *See, e.g., United States v. Certain Lots in the City of Virginia Beach, Virginia,* 657 F.Supp. at 1065, (holding that "to facilitate" a drug crime, property must be an "instrumentality" of that crime and bear more than "an incidental or fortuitous connection" to the offense). If it does not, forfeiture is not permitted. *See, e.g.,* *United States v. Premises Known as 3639 Second Street, N.E., Minneapolis, Minnesota,* 669 F.Supp. 939, 943 (D.Minn.1987), *reversed in part by United States v. Premises Known as 3639–2nd St., N.E., Minneapolis, Minnesota,* 869 F.2d 1093 (8th Cir.1989) (forfeiture of house was denied where the house was not "an integral part of an illegal drug operation" or "used in any continuing drug business" and, thus, not proved to facilitate the sale of illegal drugs). Whether property "facilitates" a violation of the Drug Act, is a statutory inquiry and not the same as the constitutional inquiry into instrumentality.

35 P.S. § 780–113(a)(31).[35] A violation of Section 13(a)(31) of the Drug Act is a misdemeanor with a maximum sentence of 30 days and a fine of $500. *Id.* Because the record lacked information on Graham's actual penalty, it is not known how he was charged with respect to the 4.6 grams of marijuana found on his person and in the vehicle when he was arrested. Notably, the amounts of marijuana discovered in the search of Young's house and used in the individual controlled buys were small enough to fit into a pocket.

■ Instrumentality considers such factors as whether the house was acquired for the purpose of committing the violations of the Drug Act; its importance to the success of the illegal activity; and whether the use of the property was deliberate or fortuitous. *Chandler,* 36 F.3d at 364; *Milbrand,* 58 F.3d at 847. In *von Hofe,* 492 F.3d 175, the house was used to grow marijuana. In *Commonwealth v. Wingait Farms,* 659 A.2d 584, 594–95 (Pa. Cmwlth.1995), *affirmed,* 547 Pa. 332, 690 A.2d 222 (1997), a horse farm was forfeited because it served as the base of a large-scale marijuana distribution scheme, involving transactions of many hundreds of thousands of dollars and the storage of 30 to 40 pounds of marijuana at any time.[36] Even the horses served as collateral for the drug operations. A strong relationship between the real property and the violation of the Drug Act was shown in *Wingait Farms.* This is not to say that instrumentality requires a drug operation the size of Wingait Farms. In *King Properties,* 635 A.2d at 133, our Supreme Court held that the house was the instrumentality of the drug offense because it served as the "base of operations" for King's sale of cocaine. That property has been "involved" in an offense does not make it the instrumentality of that offense.. *Bajakajian,* 524 U.S. at 334, n. 9, 118 S.Ct. 2028.

The importance of Young's house to Graham's offense must be established. Graham could have answered the informant's call to his cellphone at a motel or homeless shelter, instead of his mother's house. The police directed their informant to call Graham or knock on the door of Young's house at times their surveillance determined he was there. The trial court must answer the question of whether Young's house would have been the subject of a forfeiture petition had Graham's controlled buys been staged elsewhere.

■ Whether Young's vehicle was the "instrumentality" of Graham's scheme must also be considered on remand. Graham drove to one controlled buy and walked to the others. One sale may have taken place inside the vehicle on January 5, 2010, but it is just as likely that the transaction took place while the two walked to the car. A single sale inside a vehicle does not make the vehicle instrumental to the offense. *Austin,* 509 U.S. at

**35.** Section 13(a)(31) of the Drug Act states as follows:

(a) The following acts and the causing thereof within the Commonwealth are hereby prohibited:

* * *

(31) Notwithstanding other subsections of this section, (i) the possession of a small amount of marihuana only for personal use; (ii) the possession of a small amount of marihuana with the intent to distribute it but not to sell it; or (iii) the distribution of a small amount of marihuana but not for sale.

For purposes of this subsection, *thirty (30) grams of marihuana* or eight (8) grams of hashish *shall be considered a small amount of marihuana.*

35 P.S. § 780–113(a)(31) (emphasis added). No conveyance can be forfeited for a violation of this section of the Drug Act. 42 Pa.C.S. § 6801(a)(4)(iv).

**36.** One pound equals approximately 450 grams.

627, 113 S.Ct. 2801; *King Properties*, 635 A.2d at 133. Further, a vehicle cannot be forfeited where it is involved in possession of a "small amount" of marijuana. 42 Pa. C.S. § 6801(a)(4)(iv).[37]

Although London testified that he observed Graham walking from his house to the minivan and back during his meeting with the informant, London admitted that he did not see what, if anything, Graham took from the vehicle. It could have been his wallet, so he could make change, or his reading glasses or something more sinister, such as a weapon.

■ To satisfy instrumentality, it must be found that Graham's sales to an informant bore a "significant relationship" to Young's house and her minivan. This relationship requires more than happenstance or coincidence. *King Properties*, 635 A.2d at 133; *Chandler*, 36 F.3d at 365. If Young's property is shown to be merely incidental to Graham's violation of the Drug Act, instrumentality is not established.

Forfeiture makes the instrumentality of a crime unavailable in order "to prevent future criminal activity." Barclay Thomas Johnson, *Restoring Civility—the Civil Asset Forfeiture Reform Act of 2000: Baby Steps Towards a More Civilized Civil Forfeiture System*, 35 IND. L. REV. 1045, 1068 (2001–2002). The court must consider how the forfeiture of Young's home and vehicle will prevent Graham from making sales of small amounts of marijuana in the future.

### iii. Culpability

On remand, Young's degree of culpability in her son's drug activities must be established. This is necessarily a fact-

intensive inquiry. Using the framework established in *von Hofe* as a guide, the trial court must consider Young's undisputed lack of involvement in the sales of marijuana set up by police in this case. Culpability requires some level of participation. Notably, Mrs. von Hofe's criminal conviction for possession, as co-owner of the house where marijuana was grown, was not enough to warrant the loss of her half-interest in the house. The trial court must determine to what extent, if any, Young knew of her son's activities or even "turned a blind eye" to them in light of the fact that the amounts of marijuana were easily concealed. The trial court must decide whether Young's level of culpability is sufficient to justify forfeiture of her home and vehicle.

### Innocent Owner Defense

Young's next issue on appeal is that the trial court erred in rejecting her innocent owner defense. Where the Commonwealth proves that property has facilitated a violation of the Drug Act, the owner of the property may assert the so-called "innocent owner defense" in Section 6802(j) of the Forfeiture Act to prevent a forfeiture. It states as follows:

> (j) Owner's burden of proof.—At the time of the hearing, if the Commonwealth produces evidence that the property in question was unlawfully used, possessed or otherwise subject to forfeiture under section 6801(a) or 6801.1(a), the burden shall be upon the claimant to show:
>
> (1) That the claimant is the owner of the property or the holder of a chattel mortgage or contract of conditional sale thereon.

---

**37.** It states:

[N]o conveyance shall be forfeited for violation of Section 13(a)(31) of the Controlled Substance, Drug, Device and Cosmetic Act

[possession of a small amount of marijuana].

42 Pa.C.S. § 6801(a)(4)(iv).

(2) That the claimant lawfully acquired the property.

(3) That it was not unlawfully used or possessed by him. In the event that it shall appear that the property was unlawfully used or possessed by a person other than the claimant, then *the claimant shall show that the unlawful use or possession was without his knowledge or consent. Such absence of knowledge or consent must be reasonable under the circumstances presented.*

42 Pa.C.S. § 6802(j) (emphasis added).

That Young owns and lawfully acquired the house and vehicle at issue in this case is not disputed, and the Commonwealth does not claim that she has in any way "unlawfully used or possessed" her home. To avoid forfeiture, Young had the burden to show that her son's unlawful use of the property occurred "without her knowledge *or* without her consent." *Commonwealth v. 502–504 Gordon Street,* 147 Pa.Cmwlth. 330, 607 A.2d 839, 844 (1992) (emphasis added). The statute provides that lack of knowledge or consent must be reasonable under the circumstances. 42 Pa.C.S. § 6802(j)(3).

*502–504 Gordon Street* involved a tavern located in an area of Allentown where drugs were omnipresent. Over a five-month period, there were numerous raids by police leading to the arrests of 24 individuals for drug-related activities in or near the tavern. The tavern owner was not involved in the drug activities and was not charged with any crime. The trial court ordered the tavern forfeited because it facilitated violations of the Drug Act, and held that the owner could not take advantage of the innocent owner defense because he knew about the drug activity at his tavern.

■ The owner appealed and this Court reversed. We held that the owner's knowledge of the illegal drug activities was not dispositive of the defense. The innocent owner defense requires the owner to show that the illegal use of his property by others was without his knowledge *or* without his consent. *502–504 Gordon Street,* 607 A.2d at 845. Even though the owner of the tavern knew of drug activity on his property, he did not consent to that activity. Accordingly, the innocent owner defense was available to him.

This Court then reviewed the record and concluded that it established a lack of consent. The owner told patrons that he would call the police if he saw drugs on his premises; instructed his employees to do the same; called the police at least seven times; ordered patrons with drugs to leave the bar; fully cooperated with police; received threats for calling the police; and was injured when he challenged a drug transaction. Stated otherwise, the owner "did all that could reasonably be expected … to prevent the illegal use of [his] property once [he] became aware of drug activities occurring within" the tavern. *Id.* at 846. It was irrelevant that the owner's efforts were unsuccessful; the fact that he made the effort was sufficient to show a lack of consent and defeat a forfeiture of his tavern. We cautioned, further, that "property owners are not required to take heroic, vigilante or police measures to rid their property of drug activity" as such a requirement would no doubt "produce a dangerous precedent." *Id.* at 845.

The Pennsylvania Supreme Court adopted this Court's understanding of the innocent owner defense and further refined it in *Commonwealth v. $2,523.48 U.S. Currency,* 538 Pa. 551, 649 A.2d 658 (1994). There, the Commonwealth sought the forfeiture of a tavern where patrons were conducting illegal drug sales. The tavern owner's knowledge was not in dispute.

Drug transactions had been made in his presence, and police had made drug arrests both inside and outside the tavern. The question was whether he had consented to the drug activity. The Supreme Court observed that:

[T]he [forfeiture] statute does not require on its face that a landowner take *any* affirmative steps to stop the illegal use of his premises. Nonetheless, the acts or omissions of the landowner may be relevant to show lack of consent.

*Id.* at 660 (emphasis in original). That an owner's acts or omissions may be relevant, however, does not mean that the owner must become an *ad hoc* law enforcement officer to demonstrate a lack of consent. Rather, the Supreme Court clarified that

[w]e see no reason to require that a property owner's actions, or lack of action, to discourage illegal drug activity on his property be more than what are reasonable under the circumstances.

*Id.* The Supreme Court also cautioned that "what is reasonable for one property owner may not be reasonable for another." *Id.* at 662.

The Supreme Court also explained that not every owner is required to go to the lengths of the tavern owner in *502–504 Gordon Street,* who cooperated with police in ridding his property of drug activity to such a degree that he was subjected to threats and actual physical assault. The Supreme Court deemed these actions "well beyond what was necessary" to establish lack of consent. *$2,523.48 U.S. Currency,* 649 A.2d at 661.

∎ Young argues that the trial court erred in rejecting her innocent owner defense. Specifically, Young argues that her mere presence in the home during the

police search on November 19, 2009, did not prove her knowledge of Graham's drug dealing.

Young testified that she was confined to her bedroom when the search began. When she came out, the police ordered her back in her room. Young testified that she did not see the marijuana found in her dining room or the pictures of her son selling drugs that the police said they had. Billips testified that Young was in the dining room where police did the search and there when they found the packets of marijuana. Notably, Billips testified from his notes. After Young's version of the events of November 19, 2009, was presented to the trial court, Billips did not testify in rebuttal. These discrepancies were not resolved by the trial court.

However, at oral argument before this Court, the Commonwealth conceded that the police did not show Young any drugs or pictures when they conducted their search.[38] It argued, instead, that because the officers told Young about her son's sales and gave her a copy of the search warrant, she acquired knowledge of her son's illegal conduct. We disagree.

First, Young was not required to believe Billips' *allegation* that her son was selling drugs. Second, absent references to specific allegations in the probable cause affidavit, the significance of leaving that document with Young cannot be evaluated. All of the circumstances should have been considered, including Young's refusal to have anything to do with Graham in the past when he was involved with drugs.

∎ The trial court rejected Young's testimony that she did not know of Graham's conduct because she did not see or smell marijuana. N.T. 63–65. However, a

**38.** Notwithstanding this concession, the dissent treats Billips' testimony as definitive on

what Young was shown.

negative credibility finding does not constitute positive evidence that can support a finding of fact. *Yi v. State Board of Veterinary Medicine*, 960 A.2d 864, 875 (Pa. Cmwlth.2008). *See also Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion."); *California Shoppers, Inc. v. Royal Globe Insurance Co.*, 175 Cal.App.3d 1, 221 Cal.Rptr. 171, 196 (1985) ("If a witness testifies, for instance, that *it was not raining* at the time of the collision, and if the jury disbelieves that testimony, such disbelief does not provide evidence that it *was raining* at the time of the collision."). Stated otherwise, the factfinder's disbelief of Young's statement that she had no knowledge of her son's activity does not allow the factfinder to draw the contrary conclusion, *i.e.*, that she did have knowledge.

■ Our Supreme Court has explained that

[i]t is a well-recognized principle of evidence that he who has the positive of any proposition is the party called upon to offer proof of it. It is seldom, if ever, the duty of a litigant to prove a negative until his opponent has come forward to prove the opposing positive.

*Fazio v. Pittsburgh Rys. Co.*, 321 Pa. 7, 182 A. 696, 698 (1936). This is because a party required to prove a negative is saddled with a "virtually impossible burden." *Commonwealth v. Buonopane*, 410 Pa.Super. 215, 599 A.2d 681, 683 n. 2 (1991). Accordingly, courts generally "do not require litigants to prove a negative because it cannot be done." *R.A. v. Department of Public Welfare*, 41 A.3d 131, 141 (Pa. Cmwlth.2012), *rev'd on other grounds sub nom. R.A. v. Department of Public Welfare*, —— Pa. ——, 82 A.3d 370 (2013). It is problematic that a person can be deprived of her home because she is unable to prove a negative. This is why the Forfeiture Act requires the owner's lack of knowledge to be "reasonable under the circumstances presented." 42 Pa.C.S. § 6802(j).[39]

■ With respect to Young's alleged consent, the trial court did not follow our Supreme Court's specific instruction in *$2,523.48 U.S. Currency*, 649 A.2d at 662, that "[a]ll of the circumstances surrounding the property owner's actions, or lack of action, must be considered in determining if they were reasonable." Instead, the trial court held that the single way for Young to demonstrate a lack of consent was by ejecting her son from the house.

This case involves a family home occupied by a parent, her adult son and grandchildren; it is not a commercial property as was the case in *502–504 Gordon Street*. It is not necessarily "reasonable" to expect

---

**39.** The dissent suggests that the trial court fulfilled its duty to assess the evidence by stating that it did not believe Young's testimony "due to blatant inconsistencies." Trial Court Op. at 14. However, the trial court failed to identify these "blatant inconsistencies." In *Milbrand*, 58 F.3d 841, the court rejected the innocent owner defense proffered by a mother whose son was openly running a large-scale marijuana operation on a farm that she purchased and often visited. In doing so, the court pointed to the evidence that caused it to disbelieve the mother's claims of ignorance of the drug activity, *i.e.*, the magnitude of the drug operation, plants growing near the house, the mother's admission that she opened cabinets and drawers containing marijuana and drug paraphernalia, and her knowledge of what a marijuana plant looked like. *Id.* at 845. The court explained that this evidence led it to conclude that the mother "either knew or deliberately closed her eyes" to her son's drug activity. *Id.*

a parent to evict a child, even an adult child, from the family house in order to prove her lack of consent to that child's conduct. As one court has explained:

> [T]he fact that this case involves a claimant and his son is of particular significance. There is a qualitative difference between a landowner knowingly or negligently leasing or renting his property to be used for an illegal purpose, and a father knowingly or negligently permitting his son to continue living in his home while engaging in illegal conduct. While one might hope that the forfeiture laws would induce landowners to take greater care in choosing to whom they transfer possession of their property, *parents cannot choose their children. It is unrealistic to expect that forfeiture laws will induce parents to evict children from their homes.*

*United States v. Real Property Located at 6625 Zumirez Drive, Malibu, California,* 845 F.Supp. 725, 736 (C.D.Cal.1994) (emphasis added) (internal citation omitted). We find the District Court's logic persuasive. Parents cannot choose their children. It was not realistic for the trial court to hold that the only way Young could show a lack of consent was to evict her son. This is particularly so where Young, who had serious physical problems, relied upon Graham's assistance and where there were grandchildren living there.

■ We also reject the Commonwealth's argument that Young had to invite the police to her house to prove her lack of consent. An owner does not have to become an *ad hoc* law enforcement officer to demonstrate lack of consent. *$2,523.48 U.S. Currency,* 649 A.2d at 660.[40] As our Supreme Court has observed, "the statute does not require on its face that a landowner take *any* affirmative steps to stop the illegal use of his premises." *Id.* (emphasis in original).

■ The Forfeiture Act places the burden on the property owner to prove a negative, *i.e.,* lack of knowledge or lack of consent. The legislature eases this impossible burden somewhat by adding that a lack of knowledge or consent must be "reasonable" under the circumstances. It is not enough simply to disbelieve the property owner; the trial court must identify the circumstances that make it reasonable to infer that the property owner had actual knowledge and did consent to the violation of the Drug Act.

The trial court's stated reasons for rejecting Young's innocent owner defense are flawed legally as explained above. In addition, the trial court disregarded relevant evidence without explanation. We reverse and remand. The trial court must consider all the evidence offered on the innocent owner defense. This includes the deposition of Young's neighbor and the fact that relatively small amounts of marijuana were involved, which could be hidden from plain view. If Young's evidence is not credited, the trial court must explain why; it must identify the "blatant inconsistencies" in Young's testimony. Again, Officer Walker's testimony may not be given any weight.

### Clear and Convincing Evidence Standard of Proof

Young argues that this Court should adopt a "clear and convincing evidence" standard of proof for civil forfeiture cases. She argues that this higher standard of

---

**40.** The Commonwealth's suggestion that Young should have invited the police back to her house to look for drugs in order to prove lack of consent is not reasonable given her prior experience where police officers had burst through the door and punched holes in the walls of her house.

proof has been adopted in a number of government-initiated proceedings that threaten an individual with a significant deprivation of liberty or stigma. *Santosky v. Kramer,* 455 U.S. 745, 756, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The property and personal liberty rights enshrined in the United States Constitution are both implicated when one's home is confiscated. *2338 N. Beechwood Street,* 65 A.3d at 1063. Further, a forfeiture is quasi-criminal in character. *Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886). Young argues that all these factors, *i.e.,* the interests at stake, the asymmetry between the government and the individual, and the hybrid nature of a forfeiture, support the adoption of a clear and convincing standard of proof.

The Commonwealth rejoins that this Court, not Young, has raised this issue, and we may not do so *sua sponte.* It also contends that our Supreme Court has adopted the preponderance of evidence standard of proof.

Because the issue of standard of proof has not been squarely raised in this appeal, we will not address it. The precedent is mixed. The Supreme Court stated that the standard of proof was "preponderance of the evidence" in *Commonwealth v. $6,425.00 Seized from Esquilin,* 583 Pa. 544, 880 A.2d 523, 529 (2005). On the other hand, the Supreme Court has stated that it was "the Commonwealth's burden to establish by clear and convincing evidence that the criminal conduct in question is not a one time occurrence...." *King Properties,* 635 A.2d at 133; *5444 Spruce Street I,* 787 A.2d at 1120 n. 4.

### Conclusion

As our Supreme Court has cautioned, the excessive fines analysis under the Eighth Amendment requires more than "lip service." *5444 Spruce Street,* 832 A.2d

at 402–03. This is not an analysis that can be reduced to a formula "with surgical precision." *von Hofe,* 492 F.3d at 186. Rather, the serious matter of confiscating a citizen's property without compensation requires an intensive factual inquiry and a meticulous application of the legal instructions laid down by the United States Supreme Court in *Austin* and *Bajakajian* and by the Pennsylvania Supreme Court in *King Properties* and *5444 Spruce Street.*

Our Supreme Court has also cautioned that the Forfeiture Act "does not require on its face that a landowner take *any* affirmative steps to stop the illegal use of his premises." *$2,523.48 U.S. Currency,* 649 A.2d at 660 (emphasis in original). Further, "what is reasonable for one property owner may not be reasonable for another." *Id.* at 661. This requires a thorough examination of every property owner's circumstances, the owner's stated reasons for lack of knowledge or consent and any evidence offered to support the property owner's claim that he lacked knowledge of or did not consent to the illegal use of his property.

For the above-stated reasons, we reverse the order of the trial court granting forfeiture of Elizabeth Young's house and 1997 Chevrolet Venture minivan and remand for further proceedings consistent with this opinion.

### ORDER

AND NOW, this 17th day of December, 2014, the order of the Court of Common Pleas of Philadelphia County in the above-captioned case, dated May 1, 2012, is hereby REVERSED and REMANDED for further proceedings in accordance with the foregoing opinion.

Jurisdiction relinquished.

**CONCURRING OPINION by President Judge PELLEGRINI.**

While I join in the well-reasoned majority opinion, I write separately to address the issue of whether the Commonwealth must meet its burden to forfeit property by "clear and convincing" evidence or merely by the "preponderance of the evidence" standard of proof.

I acknowledge that it is not necessary to address this issue because of the way that this case has been resolved, and I also understand that we do not normally address issues not before us, even constitutional issues. However, we asked the parties to address this issue in their briefs because, as the majority points out, the precedent in this area is "mixed." This standard of proof will become even more important as a result of our recent decision in *Commonwealth v. 2010 Buick Enclave,* 99 A.3d 163, 164 (Pa.Cmwlth.2014), which held that common law forfeiture could be used to seize property that facilitated a "fraudulent income tax scheme." While, previously, forfeiture was normally applied to drug transactions, it can be now used to forfeit a bank's computer system when it engages in mortgage fraud or to forfeit property involved in an environmental crime.

More importantly, because the precedent regarding the standard of proof in forfeiture proceedings is mixed, the resolution of that issue has an important impact on how we conduct our appellate review of whether the evidence is sufficient to take property without just compensation. When, as here, a party contends that there is insufficient evidence to suggest the forfeiture, it is important to address whether we review the evidence under the preponderance of evidence standard, the lowest degree of proof recognized by the justice system, or whether we conduct our review to see if there is clear and convincing evidence to support the judgment.[1]

## I.

In the civil forfeiture context, the taking of private property implicates due process rights as guaranteed by the Pennsylvania Constitution. Article I, Section 1 of the Pennsylvania Constitution, out of which Pennsylvania's law on due process derives, provides, in relevant part: All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, **possessing and protecting ... property....**" Pa. Const. art. I, § 1 (emphasis added).

The "fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). In *Commonwealth v. Maldonado,* 576 Pa. 101, 838 A.2d 710 (2003), our Supreme Court addressed what standard of proof is required to give a person the right to be heard in a "reasonable manner." It stated that the appropriate standard of proof required in a proceeding goes to the risk that the party would suffer:

> Briefly, the function of a standard of proof is to instruct the factfinder as to the level of confidence that society believes he should have in the correctness

1. For example, in a license revocation case, we would still apply the clear and convincing evidence standard to determine whether a licensee overcame the rebuttable presumption arising from records that justified the suspension, even though the parties agreed and the trial court found that the preponderance of evidence standard applied.

of his conclusion; furthermore, different standards of proof reflect differences in how society believes the risk of error should be distributed as between the litigants. Thus, the most stringent standard-beyond a reasonable doubt-is applicable in criminal trials due to the gravity of the private interests affected; these interests lead to a societal judgment that, given the severe loss that occurs when an individual is erroneously convicted of a crime, the public should bear virtually the entire risk of error. The preponderance-of-the-evidence standard, by contrast, reflects a belief that the two sides should share the risk equally; for this reason, it is applicable in a civil dispute over money damages, where the parties may share an intense interest in the outcome, but the public's interest in the result is minimal. The clear and convincing standard falls between those two end-points of the spectrum; it is typically defined as follows:

The clear and convincing standard requires evidence that is so clear, direct, weighty, and convincing as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts [in] issue.

\* \* \*

This Court has mandated an intermediate standard of proof—clear and convincing evidence—when the individual interests at stake in a state proceeding are both particularly important and more substantial than mere loss of money. Notwithstanding the state's civil labels and good intentions, the Court has deemed this level of certainty necessary to preserve fundamental fairness in a variety of government-initiated proceedings that threaten the individual involved with a significant deprivation of liberty or stigma.

*Id.* at 715 (internal citations and quotation marks omitted).

## II.

To determine whether due process under Article I, Section 1 of the Pennsylvania Constitution has been satisfied, it is appropriate to use the analysis employed to determine whether the procedure violates due process under the Fourteenth Amendment to the United States Constitution. *R. v. Department of Public Welfare,* 535 Pa. 440, 636 A.2d 142, 152–53 (1994). The analysis used to determine due process under the Fourteenth Amendment and which has been used to determine whether there is a violation under Article I, Section 1 of the Pennsylvania Constitution is the three-prong test set forth in *Mathews.* Under that test, the court must consider (1) the private interest that will be affected by official action; (2) the risk of erroneous deprivation through the procedures used; and (3) the government interest affected by any additional or substitute procedural requirement. *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903. Because this test normally is used to determine what type of hearing—notice or a full-blown due process or timing—is required, it does not exactly fit in determining what type of standard of proof or scope of review needs to be employed, but I will base my analysis on that standard.

### A. The Private Property Interest is a Constitutional Right.

In the civil forfeiture context, the taking of private property implicates that right as guaranteed by the Pennsylvania Constitution. As noted above, under Article I, Section 1 of our Constitution, possessing property rights is a fundamental property right.[2] Because it is normally unconstitu-

---

**2.** Pa. Const. art. I, § 1; *see also Boyd v.* *United States,* 116 U.S. 616, 627, 6 S.Ct. 524,

tional to take an individual's property without just compensation, the private interest in the property is great, thereby increasing the need for a higher standard of review.

## B. The Risk of Erroneous Deprivation Through the Procedures Used.

This is the standard that applies the least to this type of analysis because the preponderance of the evidence standard seems to have been arrived at by accident. At common law, there were two forms of forfeiture proceedings. The first involved the forfeiture of a felon's real and personal property. This proceeding was *in personam* in nature and the forfeiture did not attach until the offender was convicted: " 'The necessary result was, that in every [forfeiture] case where the Crown sought to recover such goods and chattels, it was indispensable to establish its right by producing the record of the judgment of conviction.' *The Palmyra,* [25 U.S. (12 Wheat.) 1, 14 (1827) ]." *Commonwealth v. Landy,* 240 Pa.Super. 458, 362 A.2d 999, 1003 (1976).[3] Obviously, the standard of

proof under this type of forfeiture was proof beyond a reasonable doubt and any attempt to lower it would violate due process.

The second type of forfeiture proceeding was based on common law deodands and involved the forfeiture of an object causing the death of any creature. This forfeiture proceeding was *in rem* in nature and the property itself was considered the offender: "It is the property which is proceeded against, and, by resort to a legal fiction, held guilty and condemned as though it were conscious instead of inanimate and insentient." *Various Items of Personal Property v. United States,* 282 U.S. 577, 581, 51 S.Ct. 282, 284, 75 L.Ed. 558 (1931).

However:

The immediate ancestor of modern civil forfeiture law is English admiralty law where ships, the most living of inanimate things, were treated as if endowed with personality and given a gender. After the creation of the United States, violations by ships and their cargo were

---

530, 29 L.Ed. 746 (1886) ("The great end for which men entered into society was to secure their property."). As recognized in *Boyd:*

> The principles laid down in this opinion [regarding forfeiture of property] affect the very essence of constitutional liberty and security. They reach further than the concrete form of the case then before the court, with its adventitious circumstances; they apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life. It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty[,] and private property, where that right has never been forfeited by his conviction of some public offense....

*Id.* at 630, 6 S.Ct. at 532.

**3.** Civil forfeiture is often analyzed as the confiscation of three different types of property: First is contraband, which is anything that, by

law, "cannot be possessed at all or possessed only under strict conditions," such as contaminated or misbranded products, controlled substances, unlawfully possessed firearms, counterfeit money, stolen property, and vehicles with false identification numbers. Mary M. Cheh, *Can Something this Easy, Quick, and Profitable Also Be Fair? Runaway Civil Forfeiture Stumbles on the Constitution,* 39 N.Y.L. SCH. L. REV. 1, 14 (1994). Second are proceeds, which are the monetary profits derived from an illegal enterprise as well as any goods or investments purchased with that money. Third are instrumentalities, which are property used in committing a crime— they are integral to the crime, the means without which the crime could not have been committed as charged. *See* Rachel L. Brand, *Civil Forfeiture as Jeopardy: United States v. Ursery,* 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), 20 HARV. J.L. & PUB. POL'Y 292, 306 (1996).

made subject to civil forfeiture under the customs laws.

*Commonwealth v. Real Property & Improvements at 2338 North Beechwood Street Philadelphia,* 65 A.3d 1055, 1066 n. 21 (Pa.Cmwlth.2013) (citing Holmes, Jr., The Common Law 25 (1881)).[4] Courts often could not obtain *in personam* jurisdiction over those who committed maritime offenses but could obtain *in rem* jurisdiction over the wrongdoers' ocean vessels. In maritime law, an action was brought against a ship as if it were the wrongdoer. This aspect of *in rem* doctrine is known as the "guilty property legal fiction." This fiction treats inanimate objects as if they were sentient beings. Because of admiralty law and strong common law ties to common law deodand, forfeiture was considered a civil *in rem* proceeding with the normal civil preponderance of the evidence standard of proof.

While the extension of the courts' jurisdiction through the *in rem* guilty property fiction is still needed because courts still deal with property that has no owner and defendants that do not reside within the jurisdiction or that are unidentified, that fiction should not be used not to employ the proper standard of proof in forfeiture actions which are not being used to settle commercial disputes. Moreover, the guilty property legal fiction should not be used to abrogate the fundamental constitutional right to not have one's property taken without just compensation. Once it is accepted that the purpose of *in rem* forfeiture is to target not the property but a person's interest in that property, it is self-evident that the forfeiture is punishment.

Because a governmental taking of someone's home is punishment,[5] and because the "guilty property legal fiction" is an historical accident, the use of the clear and convincing evidence standard is the minimum standard that should be used to require fundamental fairness that would satisfy due process under the Pennsylvania Constitution. *See Commonwealth v. Real Property & Improvements Commonly Known as 5444 Spruce Street Philadelphia,* 574 Pa. 423, 832 A.2d 396, 399 (2003) ("It is settled law in Pennsylvania that a forfeiture effected pursuant to the Forfeiture Act [42 Pa.C.S. §§ 6801–6802] is a fine and thus subject to review under the Excessive Fines Clause." (internal citation omitted)).

While, normally, the loss of money alone is usually not a basis for employing a "clear and convincing standard" since it then would have to be applied to most civil litigation cases, that does not mean that the standard is not employed when property interests are involved. Where fundamental fairness requires it, the interest is important, or there are inherent difficul-

---

4. As the United States Supreme Court stated in *Place v. Norwich & New York Transportation Co.,*

> To say that an owner is not liable, but that his vessel is liable, seems to us like talking in riddles. A man's liability for a demand against him is measured by the amount of property that may be taken from him to satisfy that demand. In the matter of liability, a man and his property cannot be separated....

118 U.S. 468, 503, 6 S.Ct. 1150, 1162, 30 L.Ed. 134 (1886).

5. *See Austin v. United States,* 509 U.S. 602, 616 n. 9, 113 S.Ct. 2801, 2809 n. 9, 125 L.Ed.2d 488 (1993) ("[F]orfeiture proceedings historically have been understood as imposing punishment despite their *in rem* nature."); *United States v. Baird,* 63 F.3d 1213, 1223 (3d Cir.1995) (Sarokin, J., dissenting) ("Forfeiture of property ... is dependent not on the criminal nature of the property, but on the illegal use their owners make of them.... Therefore, it is the owners who are punished by the forfeiture of such property." (internal citations omitted)).

ties with the evidence, the clear and convincing evidence standard has been employed even though in the end only money is involved. *See Taddei v. Department of Transportation, Bureau of Driver Licensing*, 982 A.2d 1249, 1253 (Pa.Cmwlth.2009) (licensee must establish by clear and convincing evidence that she was not convicted of the offense in another state for which her license was suspended); *Lanning v. West*, 803 A.2d 753, 761 (Pa.Super.2002) (clear and convincing evidence required to prove an *inter vivos* gift); *In re Estate of Agostini*, 311 Pa.Super. 233, 457 A.2d 861, 865 (1983) (clear and convincing standard applied to determine lack of testamentary capacity or undue influence).

As we recently stated in *Real Property & Improvements at 2338 North Beechwood Street Philadelphia,*

Many of the most important rights guaranteed by the Constitution are rights of procedure without which the substantive rights of life, liberty and property would have little meaning. The procedures which constitute due process of law, like the right of an accused to trial by jury, are not ends in themselves but means of safeguarding these substantive rights. As Justice Frankfurter observed, "[t]he history of American freedom, is, in no small measure, the history of procedure." *Commonwealth v. Wharton,* [495 Pa. 581, 435 A.2d 158, 161 (1981) (quoting *Malinski v. New York*, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945) (Frankfurter, J., concurring)) ]. "[P]rocedural devices rooted in experience were written into the Bill of Rights not as abstract rubrics in an elegant code but in order to assure fairness and justice before any person could be deprived of 'life, liberty, or property.'" *Adams v. United States ex rel. McCann,* 317 U.S. 269, 276, 63 S.Ct. 236, 240, 87 L.Ed. 268 [ (1942) ].

65 A.3d at 1064–65.

The risk of deprivation is so important that the Fourth and Fifth Amendment protections in criminal cases are applicable in forfeiture. *United States v. United States Coin & Currency,* 401 U.S. 715, 721, 91 S.Ct. 1041, 1044–45, 28 L.Ed.2d 434 (1971) (holding that the Fifth Amendment applies to forfeiture actions); *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 702, 85 S.Ct. 1246, 1251, 14 L.Ed.2d 170 (1965) (holding that Fourth Amendment protections are applicable to forfeiture proceedings). As stated by the United States Supreme Court, forfeiture proceedings are "within the reason of criminal proceedings." *One 1958 Plymouth Sedan,* 380 U.S. at 698, 85 S.Ct. at 1249 (internal citation omitted).

With all those protections, including a beyond a reasonable doubt standard that is usually only applicable in criminal cases where a liberty interest is involved, it seems beyond cavil that the risk of someone losing his or her home and property would require a clear and convincing standard rather than just the preponderance of the evidence standard.

## C. The Government Interest Affected by Any Additional or Substitute Procedural Requirement.

Other reasons advanced by the government are that forfeiture is a powerful weapon on the "war on crime," it deters illegal activity, and it encourages property owners not to permit their property to be used for illegal activities. While those are important interests, they are not the only governmental interests involved because if they were, one could argue that the criminal "beyond a reasonable doubt" standard needs to supplant the preponderance of evidence standard. Simply, the clear and

convincing evidence standard is required by fundamental fairness because of the inherent conflict of interest involved where the government profits from forfeiture actions.

Proceedings to forfeit property are brought by the district attorney. As our Supreme Court has stated in *Commonwealth v. Dunlap*:

The important power and vast discretion vested in the district attorney mandate that where a conflict of interest exists, the proceedings should be invalidated. In our society, the district attorney has virtually unfettered discretion to determine which cases to pursue and what crimes to charge. In order to ensure that this power is properly exercised, the district attorney must be held to the highest ethical standards which include avoiding even the appearance of a conflict of interest. In his dissenting opinion [in the Superior Court] in this case, Judge Hoffman noted:

"By its very nature, (the) discretion (vested in the prosecutor) is a subjective exercise; seldom is the motive for decision on record.... Our society can tolerate a system that allows such an accretion of power despite the limited ability to review the decision[-]making process because we charge the district attorney ... with a high ethical standard. That standard the exercise of his 'judicial capacity' is breached not only by actual conflict of interest, but also by actions which have the appearance of conflict of interest."

474 Pa. 155, 377 A.2d 975, 977 (1977).

The inherent conflict of interest problem here is even more acute because the district attorney's office is the party that benefits from the forfeiture even if the funds derived from forfeiture are used for general purposes. Section 6801(f) of the Forfeiture Act provides:

Cash or proceeds of forfeited property transferred to the custody of the district attorney ... shall be placed in the operating fund of the county in which the district attorney is elected. The appropriate county authority shall immediately release from the operating fund, without restriction, a like amount for the use of the district attorney enforcing the provisions of The Controlled Substance, Drug, Device and Cosmetic Act [Act of April 14, 1972, P.L. 233, *as amended*, 35 P.S. §§ 780–101–780–144]. The entity having budgetary control shall not anticipate future forfeitures or proceeds therefrom in adoption and approval of the budget for the district attorney.

42 Pa.C.S. § 6801(f).

At the very least, this leads to the appearance of a conflict of interest because the district attorney has a direct pecuniary interest in the outcome of a forfeiture action in that all the money forfeited goes to his office. It could also lead to the appearance of a conflict of interest where a district attorney could file charges that otherwise would not have been brought, where he "hypes" the charges so that the amount at issue would justify a forfeiture, or where he bargains away charges so that the defendant agrees not to oppose the related forfeiture action. *See generally* Eric Blumenson & Eva Nilsen, Article, *Policing for Profit: The Drug War's Hidden Economic Agenda*, 65 U. CHI. L. REV. 35 (1998).

While the government has an interest in successfully prosecuting the "war on crime," in deterring illegal activity, and in encouraging property owners not to permit their property to be used for illegal activities through forfeiture, that does not mean that we should accept the preponderance of the evidence standard as appropriate to advance those interests. Those same interests are advanced by

prosecuting the underlying crimes, yet no one suggests that the preponderance of the evidence standard should supplant the beyond a reasonable doubt standard. Simply, the overriding governmental interest is to instill confidence in the criminal justice system. The present forfeiture regime severely undermines that confidence because of the inherent conflict of interest that a district attorney has in seeking forfeiture to fund his or her expenditures that the Commissioners or Council have chosen not to fund.

### III.

Because the risk that constitutionally protected private property may be taken by official action without compensation is great, the preponderance of the evidence standard is not sufficient in forfeiture proceedings. Rather, the clear and convincing evidence standard should be used because it would advance the governmental interest of enhancing society's confidence that an individual's property is being taken without compensation based on his or her conduct and not merely to fund government operations. Accordingly, I would apply the clear and convincing evidence standard to the forfeiture of property because it is required by Article I, Section 1 of the Pennsylvania Constitution.

Judge McCULLOUGH joins this concurring opinion.

DISSENTING OPINION by Judge SIMPSON.

This case involves practice under the act commonly known as the Controlled Substances Forfeiture Act (Forfeiture Act).[1] I respectfully dissent from the Majority opinion in several respects. First, I disagree with the Majority's decision to effectively overrule a recent *en banc* decision

and to adopt a new standard to evaluate penalty as part of an excessive fine analysis. Second, because the issue is not preserved and because I discern no error, I disagree with the Majority's decision to require a new evaluation of the relationship of the forfeited property to the offenses. Third, because no error is present, I would not require a new evaluation of culpability of the owner of the forfeited property. Fourth, I dissent from the Majority's decision to reverse and remand on the statutory innocent owner defense. Nevertheless, because of significant matters arising after this case was decided in the trial court, and because of lapses in the certified record, I would vacate and remand to the trial court for further proceedings.

### I. Background

The record before the fact-finder was that between November 2009 and April 2011, there were *seven* controlled drug buys from Elizabeth Young's adult son, Donald Graham, at or near Ms. Young's house and vehicle. Each was described. There was also another drug transfer by an individual who exited the house. Tr. Ct., Forfeiture Hearing, Notes of Testimony (N.T.), 5/12/12, at 46–48. In addition, based on complaints (N.T. at 16, 46, 50), there were three police surveillance operations of the house, and three searches of Ms. Young's house. Two persons were arrested in the aftermath of the police activities: Ms. Young's adult son, Graham, who was receiving mail at the house, and Baron Adams, who was apparently living at the house. N.T. at 53–55.

With regard to the three searches of Ms. Young's house, the first occurred on November 19, 2009, after a third controlled buy of marijuana from Graham. From the

1. 42 Pa.C.S. §§ 6801–6802.

house police seized two baggies containing marijuana, one clear packet containing marijuana, four pink packets containing marijuana, a scale and packaging material. N.T. at 8. The police told Ms. Young her son was selling drugs from the house. Significant for later discussion, they also showed the seized items to Ms. Young, and they explained to her what the items were. N.T. at 13–14.

After the first search of Ms. Young's house, when Graham did not turn himself in to the police, the police began another round of surveillance. There were four more controlled buys of marijuana from Graham at or near the house and vehicle. This surveillance culminated in another search of Ms. Young's house and a search of Ms. Young's vehicle. This second search occurred on January 7, 2010. The police seized 1.3 grams of marijuana from the living room of Ms. Young's house and 8.5 grams of marijuana from the vehicle. N.T. at 22. In the opinion of a police officer who conducted the search of the house and was qualified as an expert, the marijuana seized from *inside* the house was intended for sale. N.T. at 33–36. The bases for this opinion were that it was in bulk form, it was similar to the marijuana previously recovered from the controlled buys, and there were no items for personal consumption, such as cigarette papers, inside the house. *Id.* Graham was also arrested at this time, on the front steps of the house. A search of his person revealed a clear sandwich baggie containing 4.6 grams of marijuana, a cellular phone, $236 dollars (including money from one recent controlled buy), and keys to Ms. Young's house and vehicle.

Based on another complaint, the police began more surveillance of Ms. Young's house on April 25, 2011. An officer ob-

served a male leave the house and engage in a suspicious transaction.[2] The parties were stopped, and five clear plastic baggies containing 19 grams of marijuana were recovered. N.T. at 46–47. As a result, another search warrant was issued for Ms. Young's house, and it was executed later that day. From the basement the police seized numerous large Ziplock bags with marijuana residue, a birth certificate for Baron Adams, a checkbook for Baron Adams, and a scale. N.T. at 48. Confiscated from a bedroom on the second floor was $4020 (from a safe) and mail addressed to Baron Adams. Confiscated from Adams' vehicle was a large Ziplock bag containing bulk marijuana, later weighed at 521 grams, and a clear plastic bag containing 14 small jars with purple tops. N.T. at 48–49.

Evaluating the totality of the circumstances, the trial court stated,

> the evidence presented by the Commonwealth at the forfeiture hearing clearly shows that illegal drug sales were being facilitated through the use of this property. The record clearly reflects that Mr. Graham was selling illegal drugs from the property on a regular basis and that he was storing illegal drugs in the subject vehicle. Confidential informants purchased drugs at the house. Paraphernalia was recovered from inside the property as well. Therefore, the court finds that Mr. Graham was using Ms. Young's property, both the 1997 Chevrolet and her home, to facilitate the commission of illegal drug transactions.

Tr. Ct., Slip Op. at 10 (emphasis added). The trial court concluded that the Commonwealth met its burden in establishing a

2. The officer was Jeffrey Walker, whose subsequent legal problems were the basis for an application for extraordinary relief. This situation will be discussed in later in this opinion.

nexus between the property forfeited and the alleged illegal activities. *Id.*[3]

Regarding Ms. Young's excessive fine defense under the Eighth Amendment to the United States Constitution and the coextensive Article I, Section 13 of the Pennsylvania Constitution, the trial court relied upon two recent *en banc* decisions of this Court, *Commonwealth v. 5444 Spruce Street*, 890 A.2d 35 (Pa.Cmwlth.2006) (*5444 Spruce St. (Cmwlth.Ct.)* ), and *Commonwealth v. 542 Ontario Street*, 989 A.2d 411 (Pa.Cmwlth.2010). The trial court evaluated the maximum fines that could have been levied for the second (2010) surveillance of Ms. Young's house and vehicle, and determined the maximum fines exceeded the value of the assets. As to whether the violations were isolated or a pattern of unlawful behavior, and the extent of the harm, the trial court stated:

> For the past several years, Mr. Graham has continuously sold narcotics from the property. Further, this type of illicit behavior puts not only Mr. Graham's neighbors in harm's way, but also the officers investigating his unlawful activities and serving warrants in connection with that illegal conduct.

Tr. Ct., Slip Op. at 13. The trial court concluded that the property forfeited was not grossly disproportionate to the gravity of the offense. Pertaining to Ms. Young's culpability, the trial court stated, "the record clearly shows that, at best, Ms. Young turned a blind eye to her son's illegal conduct at the property." *Id.*

As to Ms. Young's statutory innocent owner defense, the trial court specifically rejected her "argument that she had no knowledge of the drug transactions taking place inside her residence or car." Tr. Ct., Slip Op. at 11. The trial court concluded: "Ms. Young has failed to establish her innocent owner defense because she did not show that the unlawful use of the subject property was without her knowledge or consent." *Id.* at 8.

## II. Excessive Fines Defense

### A. Generally

Legally, the Majority effectively overrules a recent *en banc* decision of this Court, *542 Ontario Street.* Also, for the first time it announces an unworkable scheme to evaluate the likely criminal penalty which would have been imposed had a party been convicted of a violation of the Controlled Substance, Drug, Device and Cosmetic Act (Drug Act) under a civil standard of proof. I believe these are grave errors.

In *542 Ontario Street*, this Court affirmed an excessive fines analysis which considered the conduct of the landowner and the maximum penalties prescribed by the legislature for illegal activity at a property subject to forfeiture even when the owner was acquitted of criminal charges.

The Majority effectively overrules this 2010 *en banc* decision. Dispelling any doubt, in a footnote the Majority extols the virtues of departing from *stare decisis.* Majority Op., at 857 n.23. The Majority takes a block quote, and points out "prob-

---

**3.** Pursuant to the Forfeiture Act, "[r]eal property used or intended to be used to facilitate any violation of The Controlled Substance, Drug, Device and Cosmetic Act [ (Drug Act) ], [Act of April 14, 1972, P.L. 233, *as amended,* 35 P.S. §§ 780–101–780–144], including structures or other improvements thereon ... which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of [the Drug Act] ..." is subject to forfeiture. 42 Pa.C.S. § 6801(a)(6)(i)(C). However, "[n]o property shall be forfeited ... to the extent of the interest of an owner, by reason of any act or omission established by the owner to have been committed or omitted without the *knowledge or consent of that owner.*" 42 Pa. C.S. § 6801(a)(6)(ii) (emphasis added).

lems that require correction and clarification." *Id.* at 856. However, *542 Ontario Street* was correctly decided; the Majority overlooks a central discussion in the decision.

The Majority complains that this Court improperly compared the penalty imposed by the forfeiture against the maximum penalty available as part of the first prong of the gravity of the offense analysis. However, the Majority takes the block quote entirely out of context. In the preceding *six* paragraphs, the *542 Ontario Street* Court examined the conduct of the landowner as part of the penalty prong of the gravity of the offense analysis. This was a substitute for an actual penalty, because the owner was acquitted, and no criminal sentence was imposed on him. Thus, in the paragraph *immediately preceding* the block quote, the Court summarized the owner's conduct as follows:

> In this case, the civil jury found that [the owner's] house was used by or possessed by a person other than him for an unlawful purpose, and, significantly, [the owner] knew of or consented to the use of his house by another for an unlawful use. These findings, together with the circumstances set forth in the affidavits of probable cause and police reports setting forth the results of the 2005 search, are sufficient to support a preponderance of the evidence determination [the owner] conspired with the occupant of his property to possess with intent to deliver. *As a result, it is appropriate to consider the gravity of that conduct and the maximum penalty available for the conspiracy.*

*542 Ontario Street*, 989 A.2d at 419 (emphasis added).

In sum, contrary to the characterization by the Majority, the *542 Ontario Street* Court carefully analyzed the actual conduct of the owner together with the maximum penalty available for that conduct in assessing the penalty.

The *542 Ontario Street* Court also compared the owner's conduct together with the maximum penalty to the amount of the forfeiture, but the timing of the comparison is of no moment. This is because the Court examined all three prongs of the *Bajakajian*[4] evaluation. That one comparison occurred sooner rather than later did not threaten an unfair result. Indeed, the Majority does not explain how the timing of the evaluation impacted the result, and the Supreme Court in *Bajakajian* does not require that the analysis follow a particular order.

In short, because the Majority misreads *542 Ontario Street*, it errs in effectively reversing that decision. The case was correctly decided, as it followed our Supreme Court's direction that courts "look first" to the maximum permissible fine, and "if the value of forfeited property is within the range of fines prescribed by [the legislature], a strong presumption arises that the forfeiture is constitutional." *Commonwealth v. 5444 Spruce Street*, 574 Pa. 423, 832 A.2d 396, 402 n. 7 (2003) (*5444 Spruce St. (Supreme Court)*). Indeed, our Supreme Court declined further review of *542 Ontario Street.*[5] Further, the Supreme Court recently cited the case with approval. *Commonwealth v. 605 University Drive*, —— Pa. ——, 104 A.3d 411, 420 (2014).

It is jurisprudentially unsound and in violation of the fundamental principle of *stare decisis* for this Court to unsettle an area of law which we recently settled. *See*

---

4. *See United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998).

5. *Commonwealth v. 542 Ontario Street*, 609 Pa. 703, 16 A.3d 503 (2011).

*Gardner v. Consol. Rail Corp.*, 524 Pa. 445, 573 A.2d 1016 (1990); *Fagan v. Dep't of Transp. of Commonwealth,* 946 A.2d 1123 (Pa.Cmwlth.2008).

Worse, instead of an analysis of the owner's actual conduct, the Majority declares a different substitute for an actual penalty: "Where there is no actual penalty, the Commonwealth can prove, using a civil standard of proof, an offense of the Drug Act and the likely penalty that would have been imposed." Majority Op., at 857. Thus, the Majority substitutes assessment of a hypothetical criminal penalty for an analysis of actual conduct.

There are several problems with this approach. The most obvious is that there is no authority for it. The Majority just makes it up. Also, assessment of a non-existent criminal penalty appears subjective, straying from our Supreme Court's express preference for a more objective standard in evaluating gravity of the offense. *5444 Spruce Street (Supreme Court),* 832 A.2d at 402 n. 7. Further, the approach appears unworkable without further guidance on how a party proves or disproves a likely criminal sentence in the absence of a criminal conviction or prosecution.

In reality, the Majority's real agenda is to imperil civil forfeitures in the absence of a criminal conviction,[6] contrary to settled law.[7] Further, such an approach has the effect of subjecting at least part of the civil forfeiture proceedings to a standard of proof beyond a reasonable doubt, a significant departure from settled law.[8] I also

**6.** The Majority states that "In *Bajakajian,* criminal charges that were filed but did not result in a conviction received no consideration or weight. *A fortiori,* criminal charges that could have been filed, but were not filed, should receive no consideration or weight." Majority Op., at 853 n.18.

**7.** *United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984) (*in rem* civil forfeiture can apply where the claimant is acquitted of the criminal charges); *Commonwealth v. 605 University Drive,* —— Pa. ——, 104 A.3d 411, 424 (2014) ("Pennsylvania's intermediate appellate courts have ... properly and consistently considered *in rem* forfeiture[s] to be civil proceedings resulting from criminal wrongdoing.") (Citations omitted.); *Commonwealth v. Esquilin,* 583 Pa. 544, 880 A.2d 523, 529 (2005) ("[F]or property to be deemed forfeitable, neither a criminal prosecution nor a conviction is required.") (citing *Commonwealth v. $11,600.00 Cash, U.S. Currency,* 858 A.2d 160 (Pa.Cmwlth.2004); *Commonwealth v. 502–504 Gordon Street,* 147 Pa.Cmwlth. 330, 607 A.2d 839 (1992), *aff'd per curiam,* 535 Pa. 515, 636 A.2d 626 (1994)); *see also Commonwealth v. 2010 Buick Enclave,* 99 A.3d 163, 168 (Pa. Cmwlth.2014) ("The courts of this Commonwealth have long recognized that the execution of statutory forfeiture is not dependent on a conviction."); *Commonwealth v. $15,000 U.S. Currency,* 31 A.3d 768, 773 (Pa.Cmwlth. 2011) ("There is no requirement that drugs be present in order to subject seized property to forfeiture, and *there is similarly no requirement that a criminal prosecution or conviction result from the incident.*") (Emphasis added.); *Commonwealth v. Assorted Consumer Fireworks,* 16 A.3d 554, 558 (Pa.Cmwlth. 2011) (property is forfeited *"not* as a result of a criminal conviction but in a separate civil proceeding"; there need not be a criminal conviction in order to sustain a forfeiture) (emphasis in original); *Commonwealth v. 542 Ontario St.,* 989 A.2d 411 (Pa.Cmwlth.2010), *appeal denied,* 609 Pa. 703, 16 A.3d 503 (2011) (it is not necessary that a forfeiture be supported by an underlying criminal conviction); *Commonwealth v. Perez,* 941 A.2d 778 (Pa.Cmwlth.), *appeal denied,* 598 Pa. 751, 954 A.2d 578 (2008) (same); *Commonwealth v. $259.00 Cash U.S. Currency,* 860 A.2d 228 (Pa.Cmwlth.2004) (*en banc*) (same); *Commonwealth v. Giffin,* 407 Pa.Super. 15, 595 A.2d 101 (1991) (same); *Commonwealth v. One 1988 Ford Coupe,* 393 Pa.Super. 320, 574 A.2d 631 (1990) (same); *Commonwealth v. One 1974 Chevrolet Box–Type Truck,* 126 Pa. Cmwlth. 173, 559 A.2d 76 (1989) (same).

**8.** To meet its burden in a forfeiture proceeding, the Commonwealth must establish, by a preponderance of the evidence, that a nexus exists between the property subject to forfeiture and a violation of the Drug Act. *Esquilin;*

agree with Amicus Curiae Attorney General that a predictable, if unacknowledged, consequence of the Majority's holding will be an increase in the number of sham or strawmen owners in forfeiture and return of property cases. Br. of Amicus Curiae in Support of Commonwealth of Pennsylvania at 2.

Moreover, no party advocates such an approach. I believe it unwise to reverse the trial court on a new legal approach that no party sought and has never been applied in case law anywhere.

## B. Penalty

In its remand discussion, the Majority makes certain requirements that relate to all three prongs of the *Bajakajian* test. With regard to the first prong, penalty, the Majority requires the Commonwealth to present evidence on the actual criminal history of Ms. Young's son, Graham.

What the Majority neglects, however, is that the Commonwealth offered such evidence to the trial court here. Specifically, the Commonwealth offered into evidence Exhibit C–2, a certified copy of the criminal record for Graham, a/k/a McIver, and Exhibit C–3. It also offered a certified copy of the criminal record of Adams, which allegedly lists Adams' address as Ms. Young's property. N.T. at 53–55. Also offered into evidence were Exhibit C–4, a certified driving record for Graham (purportedly showing a revoked license),

and Exhibit C–6, a certified driving record for Adams (which also supposedly shows his address as Ms. Young's house). *Id.*[9] None of these exhibits, however, are part of the certified record. On remand the Commonwealth should supplement the record to correct this deficiency.

## C. Pattern of Misbehavior

On the second prong, the Majority also requires the trial court on remand to consider whether there was a pattern of misbehavior at Ms. Young's property that was extensive in time and space. The Majority also declares that the Commonwealth cannot rely on any testimony from Officer Jeffrey Walker.

Some of the trial court's findings are based on testimony from Walker. At the initial oral argument in this case, the Commonwealth informed this Court that Officer Walker was under a 2013 federal indictment, filed after the trial court rendered its decision. Answer in Opp'n to Claimant's [Young's] Appl. for Extraordinary Relief at ¶ 11. This Court asked whether remand was appropriate. *Id.* at ¶ 12. The Commonwealth (incorrectly) indicated that the trial court did not materially rely on Officer Walker's testimony. *Id.* Apparently not in agreement with the Commonwealth's request to review the record without reference to Officer Walker's testimony, Ms. Young thereafter filed

---

*$11,600 Cash* (citing *Commonwealth v. 4029 Beale Avenue,* 545 Pa. 172, 680 A.2d 1128 (1996)); *Commonwealth v. McJett,* 811 A.2d 104 (Pa.Cmwlth.2002); *Commonwealth v. Wingait Farms,* 659 A.2d 584 (Pa.Cmwlth. 1995). The criminal burden is proof beyond a reasonable doubt; however, proof in a forfeiture proceeding must satisfy only a preponderance of the evidence standard. *542 Ontario St.; Perez; Commonwealth v. $3,222.00 U.S. Currency,* 856 A.2d 288 (Pa.Cmwlth.2004); *Commonwealth v. $73,671.30 Cash, U.S. Currency (Artello/Smith),* 654 A.2d 93 (Pa. Cmwlth.1995) (Pellegrini, J.); *see also Assort-*

*ed Consumer Fireworks.* A preponderance of the evidence standard, the lowest evidentiary standard, is tantamount to a "more likely than not" inquiry. *Esquilin,* 880 A.2d at 529. Clearly, proof in a forfeiture proceeding may be sufficient to meet that lesser standard even though it may be insufficient to obtain a criminal conviction. *542 Ontario St.*

9. Given these exhibits, the Majority's criticism of the Commonwealth and the trial court for failing to receive this evidence is unfounded.

an Application for Extraordinary Relief, in which she asked for a new trial. In the absence of agreement, we denied Ms. Young's Application.

While I disagree with some of the Majority's legal analysis and conclusions, I agree that a remand is appropriate. Rather than usurping the trial court's fact-finding role, however, I would allow the trial court to decide credibility issues related to the testimony of Walker. Further, since the Majority requires that the record be supplemented on remand by evidence of criminal histories, I would also allow the Commonwealth to substitute evidence from other sources to replace the evidence offered through Walker relating to the 2011 incident with Adams. This is not prohibited by the Majority opinion.

### D. Harm

As to the third prong, harm caused by drug sales at the property, the Majority determines that the trial court's findings of harm are not supported in the record. I disagree with this position.

As to the extent of the harm, the trial court stated:

> For the past several years, Mr. Graham has continuously sold narcotics from the property. *Further, this type of illicit behavior puts not only Mr. Graham's neighbors in harm's way, but also the officers investigating his unlawful activ-*

*ities and serving warrants in connection with that illegal conduct.*

Tr. Ct., Slip Op. at 13 (emphasis added).[10]

The trial court's findings are supported by the record. Given the circumstances of seven controlled buys at or around the house and vehicle, the surveillance of the house and the vehicle, the three searches of the house, and the arrest of Graham at the house, the trial court could properly infer that such activities carried risk to the police officers involved. Thus, the trial court could draw on common sense to infer that police field operations, especially those involved in executing search and arrest warrants in drug trafficking cases, carried more risk than other police duties, such as administrative duties, traffic duties, or appearances in court. The Majority's dismissive approach to law enforcement risk is not supportable. Further, the Majority's refusal to consider inferences favorable to the prevailing party is a departure from its proper appellate role.

As to harm to the neighbors, the Majority overlooks that the police acted on at least two complaints. N.T. at 16, 46, 50. Moreover, the trial court could properly infer that the neighbors are put at risk when drugs are being sold in the neighborhood.

The Majority's reliance on the deposition testimony of a neighbor to contradict the trial court's findings is improper, for

---

**10.** The Majority also states that evidence of actual harm is necessary and that reliance on self-evident harm was overruled by the Supreme Court in *Commonwealth v. 5444 Spruce Street,* 574 Pa. 423, 832 A.2d 396 (2003) (*5444 Spruce St. (Supreme Court)*). This statement is not a basis for reversal, for several reasons.

First, and most important, the trial court did not make a finding based on self-evident harm; rather, as demonstrated below, the trial court made a finding based on extensive evidence of police field operations, complaints, and reasonable inferences. These are

the same type of findings of harm considered in the excessive fine analysis in *542 Ontario Street.*

Second, I disagree with the Majority's reading of *5444 Spruce Street (Supreme Court).* In the decision, the Supreme Court did not forbid consideration of the cost to society of the traffic in illegal drugs. Rather, the Court held that all the *Bajakajian* factors must be considered, not just the social cost of drug trafficking. The trial court here considered all three prongs of the *Bajakajian* test, consistent with *5444 Spruce Street (Supreme Court).*

several reasons. First, the trial court did not refer to the testimony and apparently decided to give it no weight. Second, there were serious procedural problems with the deposition. In particular, the deposition was held on short notice the day before the forfeiture hearing, and Commonwealth counsel could not attend. N.T. at 82. Commonwealth counsel never had the opportunity to cross-examine the witness. *Id.* In fact, Commonwealth counsel had never even seen the transcript when it was offered into evidence. *Id.* Third, the transcript of the deposition is not part of the certified record. The Majority relies instead on the summary of the deposition made by counsel for Ms. Young. N.T. 82–84. The Majority, however, ignores the rule that what lawyers say is not evidence. *E.g.,* Pa.S.S.J.I. (Civ.) § 1.190(1) (4th ed. 2013) ("The lawyers are *not* witnesses and what they say is *not* evidence in the case.") (Emphasis in original). Thus, a lawyer's summary of testimony *dehors* the record cannot form a basis to undo the trial court's factual findings.

In any event, if the record is to be supplemented on remand by the neighbor's deposition transcript, the Commonwealth must be given an opportunity to cross-examine the witness. Further, the Commonwealth should be given the opportunity to supplement its proof of harm. This is consistent with the second remand in *5444 Spruce Street (Cmwlth. Ct.),* and it is not prohibited by the Majority opinion.

### E. Relationship of Property to Offense

Without citation to the record, the Majority states: "Young argues that instrumentality must be considered whenever a

civil *in rem* forfeiture is challenged under the Eighth Amendment...." Majority Op., at 858. The Majority agrees with this supposed argument, and cites cases from other jurisdictions. Ultimately, the Majority remands for a decision on whether Ms. Young's house and car were "instrumentalities" of drug sales, and it criticizes evidence of the relationship of the property to the offenses. I dissent from the Majority's positions.

First, the Majority is simply wrong that Ms. Young requested a discrete Eighth Amendment instrumentality analysis in either the trial court or in this Court on appeal. The Majority does not cite to the issue's preservation in the notes of testimony before the trial court or quote any language in the briefs in either court,[11] and I can find no reference. Not surprisingly, the trial court made no findings and offered no discussion on a constitutional "instrumentality" challenge, apart from its "nexus" analysis under the Forfeiture Act. Importantly, Ms. Young does not contest the trial court's determination of "nexus" on appeal. Instead, she argues:

the trial court erred in two key ways: (1) by finding that the forfeiture did not violate the excessive fines clause of the United States Constitution or Article I, Section 3 of the Pennsylvania Constitution based on an assessment of the fines that could have been imposed on *Mr. Graham,* not Ms. Young, or, alternatively, on the mistaken assumption that denial of the innocent owner defense automatically forecloses an excessive fines defense; and (2) by denying Ms. Young's defense that she is an innocent owner.

11. The Majority generally cites pages 7–11 and 15–16 of Ms. Young's Supplemental Brief for the general proposition that she preserved this issue. My review of those pages fails to reveal any such assertion. More importantly,

however, the Majority fails to identify anywhere in the record or briefs before the trial court that a relationship argument was preserved.

Appellant's Br. at 7 (emphasis in original); *see also* Appellant's Reply Br. at 3. For these reasons, the issue is not properly before us, and I would not start a new litigation process now in this long-delayed case.

Second, I disagree with the Majority's unexplained conclusion that the "nexus" analysis under the Forfeiture Act is different from a constitutional relationship test. This conclusion is inconsistent with Pennsylvania Supreme Court precedent. *Commonwealth v. Wingait Farms*, 547 Pa. 332, 690 A.2d 222, 226–27 (1997) (applying Forfeiture Act, fact-finder's determination that property facilitated violation of Drug Act tantamount to determination forfeiture not excessive under constitutional provisions requiring sufficient relationship of offense to the property). Although the Majority states that the inquiries are different, it relies on several federal cases and cases from other states that do not involve Pennsylvania's Forfeiture Act.

Third, I disagree with the Majority's reliance on out-of-jurisdiction cases. There is sufficient guidance from the Pennsylvania Supreme Court on the relationship of the property to the offenses analysis. The trial court's analysis is consistent with that authority.

In *Wingait Farms*, the Pennsylvania Supreme Court rejected an excessive fines challenge to the civil *in rem* forfeiture of a farm and horses. The Court stated: "A constitutionally excessive forfeiture, therefore, would be one in which the property was not significantly utilized in the commission of the drug-related offense." *Id.* at 227. In his concurring opinion, Justice Cappy added:

> Moreover, *'significantly' should be defined as requiring a pattern of similar use of the property, in other words, a repeated use of the property to facilitate the violation of the law.* 'Otherwise significant property interests might become forfeit based on the unusual and unaccustomed incident.'

*Id.* at 227–28 (Cappy, J., concurring) (emphasis added) (citation omitted).

In this case, the trial court found that there was a pattern of similar use of the house and car together to facilitate drug sales, based on numerous controlled buys from Ms. Young's son, Graham, and the results of several searches of the house, of the car, and of Graham on the front steps of the property. This clearly satisfies the Pennsylvania Supreme Court standard for significant use of the property.

Finally, I believe the Majority acts beyond its appellate mission when reviewing the evidence of the relationship between Ms. Young's property and the repeated drug sales by her son. As previously discussed, there were *seven* controlled buys of marijuana from Graham. In addition, there was another transaction involving Adams. There were three searches of the real estate, a search of Young's vehicle and a search of Graham's person incident to his arrest at the property. The trial court was not required to parse these events into before-and-after time frames, nor was it required to distinguish sales inside the real estate, from sales inside the vehicle, from sales on the sidewalk nearby.

As the fact-finder, the trial court was permitted to view the totality of the circumstances and determine that Ms. Young's house and vehicle were being used by Graham together as part of an on-going drug sales operation. Nor was the trial court obligated to dissect the detailed testimony of the seven controlled drug buys, looking for inferences unfavorable to the Commonwealth; rather, as the fact-finder, the trial court was permitted to draw inferences favorable to the Commonwealth regarding the controlled buys, and it obvi-

ously did so. In short, the Majority's efforts to re-weigh the evidence are inappropriate.

### F. Ms. Young's Culpability

I agree with the Majority that an excessive fines analysis entails an evaluation of the culpability of the owner; however, I disagree that there was any error in the trial court's analysis. Also, I disagree with the Majority's reliance on out-of-jurisdiction cases.

The trial court addressed Ms. Young's culpability. The trial court stated: "This Court finds that the Commonwealth established to a preponderance of the evidence that Ms. Young either knew of or consented to her son's illegal activities." Trial Ct., Slip Op. at 13. The trial court also stated: "[T]he record clearly shows that, at best, Ms. Young turned a blind eye to her son's illegal conduct at the property." *Id.*[12]

The substantial evidence supporting the trial court's finding is recounted in detail in the next section. It is sufficient here to acknowledge that the trial court's findings and conclusions are similar to those in *542 Ontario Street*, which supports the trial court's decision.

In *542 Ontario Street*, the owner did not live at the property, which he rented to another. Similar to this case, in 2004 the police received complaints about the property, and they began surveillance. Five controlled buys were made. Based on this, the police obtained and executed the first search warrant at the property, finding drugs and paraphernalia. The owner

was not charged, but he learned of the situation and indicated a willingness to cooperate with law enforcement efforts.

In 2005, after an additional investigation and more controlled drug buys, a second search warrant was executed at the property, and controlled substances with a value of $180 were recovered. On this occasion the owner was criminally charged. Ultimately, a criminal jury acquitted the owner.

Nevertheless, the Commonwealth sought forfeiture of the house. A subsequent civil jury determined the property was subject to forfeiture. As in this case, the fact-finder found that the owner knew of or consented to use of the house by another for an unlawful use.

The similarities between *542 Ontario Street* and this case are noteworthy. In both cases it was only after law enforcement informed the owner of the illegal activities at the property, and the illegal activities continued that forfeiture was pursued. In both cases the fact-finder on the forfeiture issue found that the owner knew of or consented to the illegal activities at the property. In both cases forfeitures were ordered despite the lack of criminal convictions involving the owner. I believe *542 Ontario Street* controls the culpability analysis here.

Moreover, the trial court's finding of "turning a blind eye" is sufficient to defeat Young's lack-of-criminal-culpability defense, even under an analysis more favorable to Ms. Young than previously applied

---

12. *See United States v. One 1973 Rolls Royce (Goodman)*, 43 F.3d 794, 808 (3d Cir.1994) (recognizing that the "mainstream conception of willful blindness [is] a state of mind of much greater culpability than simple negligence or recklessness, and more akin to knowledge."); *see also United States v. Rivera*, 944 F.2d 1563, 1570 (11th Cir.1991) (willful blindness equated with the concept of "delib-

erate ignorance" and treated as a state of mind equally culpable as actual knowledge); *United States v. Rothrock*, 806 F.2d 318, 323 (1st Cir.1986) ("The purpose of the willful blindness theory is to impose criminal liability on people who, recognizing the likelihood of wrongdoing, nonetheless consciously refuse to take basic investigatory steps.").

in Pennsylvania. *See, e.g., United States v. Milbrand,* 58 F.3d 841, 848 (2d Cir.1995) (mother had a "significant degree of culpability" in criminal use of property she owned, and which her son used to grow marijuana, despite the fact she was not prosecuted or convicted, where court found mother "would have to have been blind not to have been aware of her son's marijuana activities, or would have to have consciously and purposefully ignored signs of such activities," and that her testimony that she was not aware was "simply not credible.")

The Majority adopts the analysis of the Second Circuit in another case, *von Hofe v. United States,* 492 F.3d 175 (2d Cir.2007). Because *von Hofe* is clearly distinguishable, the Majority errs.

In *von Hofe,* the claimants, a husband and wife, challenged a federal trial court's decision that ordered the forfeiture of their home, asserting the forfeiture constituted an excessive fine. In that case, police executed a search warrant for the home, which yielded, among other things, 65 marijuana plants. The husband and wife were convicted of various criminal offenses under state law. The federal government brought an *in rem* forfeiture action against the home. The only crime to which the wife pled guilty was possession of a controlled substance, while her husband pled guilty to manufacturing and distributing such substances. Ultimately, the Second Circuit agreed with the federal trial court that the forfeiture of the husband's interest in the home did not violate the Excessive Fines Clause, but it reversed the forfeiture judgment as to his wife. Specifically, the Court stated:

> [The wife] bears minimal blame for the criminal activity that occurred at 32 Medley Lane. The record is devoid of any evidence indicating her use of drugs or her involvement in any criminal activity whatsoever. *See [United States v. 32 Medley Lane,* 372 F.Supp.2d 248, 267 (D.Conn.2005) ]. We also have no evidence to suggest [the wife] encouraged or promoted the offensive conduct occurring at 32 Medley Lane. This separates her from the *Milbrand* claimant, who acted as a strawman in a sham transaction to shield her son's criminal activity, 58 F.3d at 848, and the *Collado* [13] claimant, who actively aided her son's narcotics trafficking by repeatedly warning his confederates about possible police surveillance, 348 F.3d at 327–28. And although [the wife] may have known her husband smoked his marijuana with friends and family, *we are bound by the district court's finding that she was not 'aware that either her sons or husband were [sic] selling or bartering the marijuana in her home,' which distinguishes her from the claimants in Collado and Milbrand, both of whom appear to have known the full extent of the narcotics trafficking that occurred on their property. 32 Medley Lane,* 372 F.Supp.2d at 255. *The absence of proof on this point is relevant; not only does narcotics trafficking cause significant harm to the community, but a property owner who countenances narcotics trafficking might have a pecuniary incentive to permit the activity.*

*von Hofe,* 492 F.3d at 188–89 (emphasis added). Additionally, the Court pointed to the fact that the husband and wife owned the home as joint tenants. "Saying [the wife] allowed her husband to engage in illegal activity on the property ... must be taken in the context of [the couples'] joint tenancy. [The husband] did not need his wife's permission to use the property; joint ownership of [the home] entitled [the

---

**13.** *See United States v. Collado,* 348 F.3d 323 (2d Cir.2003).

husband] to use the property as if he were the sole owner." *Id.* at 189.

Here, unlike in *von Hofe*, the trial court found "the Commonwealth established to a preponderance of the evidence that *Ms. Young either knew of or consented to her son's illegal activities on the subject properties.*" Tr. Ct., Slip Op., at 13 (emphasis added). As set forth below, the record amply supports the trial court's finding that Ms. Young knew of her son's illegal activities. N.T. at 89, 14. Additionally, unlike in *von Hofe*, where the claimants owned the home at issue as joint tenants, here Ms. Young was the sole owner of the property. Thus, Graham needed Ms. Young's consent to be on the property, and she had authority to exclude him based on his illegal activities, but did not do so.

Also, in *United States v. Sabhnani*, 599 F.3d 215 (2d Cir.2010), the Second Circuit later distinguished *von Hofe*, where the claimant knew of the illegal activity occurring on his property, explaining:

> We find *von Hofe* easily distinguishable. As we have already discussed, *the trial testimony is clear that [the claimant] both knew of the criminal conduct taking place inside his residence* and participated in it. This distinguishes *von Hofe, in which we found it significant to her level of culpability that Mrs. von Hofe neither knew of the drug trafficking* nor in any way "encouraged or promoted" it. *Id.* at 188. In [*Collado*], *we rejected a constitutional challenge to a forfeiture action against a building owner who was 'willfully blind' to the drug trafficking taking place in her building.* Collado, 348 F.3d at 327–28.... See also [Milbrand, 58 F.3d at 848] (forfeiture of mother's interest in farm on which son conducted marijuana trafficking was not excessive because evidence demonstrated that she must have known of criminal conduct taking place there ).

*Sabhnani*, 599 F.3d at 263 (emphasis added).

In sum, because the trial court found that Ms. Young was told of her son's activity at the property, she knew of the illegal activity. Under these circumstances, *von Hofe* does not apply.

### III. Innocent Owner Defense

In addition, the Majority reverses the trial court and remands Ms. Young's statutory innocent owner defense.[14] The Majority first declares that Ms. Young was not required to believe what a police officer tells a citizen about an alleged crime. Second, recognizing that the trial court rejected Ms. Young's testimony as not credible, the Majority declares that a negative credibility finding does not constitute positive evidence that can support a finding of fact regarding Ms. Young's culpable knowledge. Lastly, the Majority cites a

---

14. Once the Commonwealth proves a nexus between unlawful activity and a property, the owner of the property bears the burden to assert an "innocent owner defense" under Section 6802(j) of the Forfeiture Act, 42 Pa. C.S. § 6802(j). *Commonwealth v. $2,523.48 U.S. Currency*, 538 Pa. 551, 649 A.2d 658 (1994). Section 6802(j) allows the property owner to argue that she either lacked knowledge of, or did not consent to, the unlawful activity that occurred at the property. 42 Pa.C.S. § 6802(j).

To successfully assert the innocent owner defense, the property owner must show: (1) she is the owner of the property, (2) she lawfully acquired the property, and (3) the property was not unlawfully used or possessed by her. *Id.* Further, if a person other than the property owner unlawfully used or possessed the property, the property owner must show the unlawful use or possession was without her knowledge or consent. *Id.* Importantly, "[s]uch absence of knowledge or consent must be reasonable under the circumstances presented." *Id.*

California federal case for the proposition that a parent is not required to throw a drug-dealing son out of the house. For the following reasons, I disagree with the Majority.

My primary concern with the Majority's approach on this issue is that it is based almost exclusively on the testimony of Ms. Young and the rejection of the Commonwealth's evidence. However, that is the opposite of how the fact-finder resolved the issue. The trial court specifically rejected Ms. Young's "argument that she had no knowledge of the drug transactions taking place inside her residence or car." Tr. Ct., Slip Op. at 11. Indeed, the trial court stated, "this Court observed Ms. Young's demeanor and behavior during her testimony. This Court simply did not believe Ms. Young's testimony due to blatant inconsistencies." *Id.* at 14. Instead, the trial court relied on the Commonwealth's evidence. *Id.* at 11.[15] The trial court concluded: "Ms. Young has failed to establish her innocent owner defense because she did not show that the unlawful use of the subject property was without her knowledge or consent." *Id.* at 8.

As to whether a citizen must believe what a police officer says about an alleged crime, a citizen can ignore information from any source. She does so, however, at her own peril. Here, the fact-finder believed the source, the police officers. Given the detailed testimony from them, no abuse of discretion is evident. Thus, the following colloquy occurred during the direct and cross-examinations of Officer Robert Billips, respectively, regarding the search warrant executed on Ms. Young's home in November 2009 (with emphasis added):

*Q.* Now, officer, you indicated that you had a discussion with the lady that you identified in court today as Ms. Young. What were the contents of that discussion?

*A. I explained to Ms. Young myself and my partner, Sergeant Woody—that we were there with a search warrant for narcotics for her son.*

*We explained that her son had been selling drugs out of the house and using a vehicle on several different days.*

*We left her a copy of the search warrant and a copy of the probable cause.* I asked her would she call her son. She didn't call her son at that time.

I used my cellphone and I called him, 267 [###-####], and I told him that we have a search warrant we're in his mother's house. Do [sic] he want to come turn himself in? He said I'll talk to my lawyer and turn myself in.

*Q. When you had that discussion on the cellphone where was Ms. Young?*

*A. She was present. All this took place in the dining room.*

\* \* \* \*

*Q.* Did Ms. Young ask you or your sergeant any questions during your conversation?

*A. Asked why we were there and we explained that we had a search warrant because her son was selling drugs on*

---

**15.** The Majority inaccurately states that the trial court failed to identify the blatant inconsistencies which caused it to disbelieve Ms. Young and caused it to find that she had knowledge of the illegal activity. Majority Op. at 869 n.39.

The trial court wrote, "But the record in no way supports [Ms. Young's contention that she had no knowledge of the drug transactions]. For one thing, the police had served several search warrants at the property, thus giving Ms. Young effective notice of the unlawful activities. *For another thing, the record indicates that the police had personally informed Ms. Young of her son's alleged illegal activities well before the date of his arrest."* Tr. Ct., Slip Op. at 11 (emphasis added).

*more than one occasion out of her house and also using the [1997 Chevrolet].*

Q. Did she ask you for any evidence or any proof of her son selling drugs at that time?

A. We left a copy. *We explained the search warrant. We left a copy of the search warrant along with the probable cause.*

Q. Did she ask you to show her any other evidence, pictures or anything like that?

A. No. But we did, *all the evidence that we gathered, prior to leaving, we showed her what we confiscated out of her house and explained to her what the items were.*

*For example, the empty bags, we say these are used to package marijuana, the baggies of marijuana. This is the marijuana. We have a scale. We showed her things like that prior to us leaving the residence.*

Q. What was her reaction?

A. She was in disbelief.

N.T. at 8–9, 13–14.[16]

Of particular significance is that the police officers showed Ms. Young the search warrant and supporting probable cause affidavit, and they informed her that they were going to arrest her son for selling drugs, including more than one occasion from her house. Further, the officers also showed her drugs, showed her packaging material, showed her a scale and other evidence seized from her house, and they explained to her what the items were.

I also struggle to understand the Majority's pronouncement that a negative credibility finding does not constitute positive evidence of Ms. Young's knowledge. Be-

cause Ms. Young had the statutory burden of proof on this issue, the Majority's pronouncement makes no sense. Once the trial court rejected her testimony, Ms. Young could not carry her burden. The Commonwealth was not required to offer "positive evidence that can support a finding of fact" on this issue. Nevertheless, the Commonwealth offered the testimony above, which persuaded the fact-finder. The Majority's added complaint that the General Assembly incorrectly placed the statutory burden of proof on the party asserting the innocent owner defense only makes its position more confusing.

Given the testimony referenced above, I would affirm the trial court's rejection of the innocent owner defense. I would not burden the parties with rehashing this issue on remand.

Lastly, for legal and factual reasons, I dissent from the Majority's rule that a parent is not required to throw a drug-dealing son out of the house. Legally, the Majority quotes part of the discussion in *United States v. 6625 Zumirez Drive, Malibu, California,* 845 F.Supp. 725, 736 (C.D.Cal.1994), for the apparent *per se* rule. Unfortunately, the Majority does not include the entire quote. Omitted from the Majority's quote is the *next sentence* of the *Malibu* court's discussion: *"This does not mean that parents should be shielded from the forfeiture laws;* rather, it means that the Court considers the relationship between the parties in evaluating the gravity of the landowner's conduct." *Id.* (emphasis added).

Factually, Young's son, Graham, had an admitted prior record of drug offenses. N.T. at 64; *see also* N.T. at 53–54 (offer of

16. The Majority asserts that the Commonwealth conceded at oral argument that the police did not show Ms. Young any drugs when they conducted their search. I have no

memory of the Commonwealth conceding anything other than what was set forth in the testimony of Officer Billips.

Exhibit C–2, certified copy of prior record Donald Graham, a/k/a Donald McIver, including multiple narcotics seizures, into evidence). He was born October 12, 1965 and was approximately 45 years of age at the relevant times. *See* Commonwealth of Pennsylvania's Reply to Claimant Elizabeth Young's Appl. for Supersedeas or Stay of Eviction, Ex. I at 13. Thus, this is not the "child" referenced by the Majority. Majority Op., at 867–68. According . to Young, she and her son "never really had a close relationship. . . ." N.T. at 64. Also, there was no evidence that Graham was dependent on Young or that he had no other place to live. Furthermore, Young testified that she would immediately put him out if he had drugs in the house. *Id.* at 67. Young would "call the cops on him myself." *Id.* Under these conditions, there is no factual basis to apply the *Malibu* court's approach to family drug-dealing here.

For these reasons, I disagree with the Majority's decision to reverse and remand on the statutory innocent owner defense.

## IV. Conclusion

For all these reasons, I believe the most prudent course would be to vacate the trial court's forfeiture orders and remand for further proceedings on Mrs. Young's excessive fine challenge, particularly the three prongs of the *Bajakajian* gravity of the offense analysis. Unlike the Majority, I would not overrule any Pennsylvania cases or adopt out-of-jurisdiction analyses. I would allow the trial court to consider the 2011 incident involving Adams to the extent it is supported by credible evidence. Further, because the issue is not preserved and because I discern no error, I would not require a new evaluation of relationship of the property to the offense. Additionally, because no error is present, I would not require a new evaluation of Ms. Young's culpability.

As to Ms. Young's statutory innocent owner defense, I discern no error on the part of the trial court. Therefore, I would not remand this issue.

Judge LEADBETTER joins in this dissent.